L. Lee Stanton and Helen La Fetra Stanton et al. [1] v. Commissioner. Stanton v. Comm'r
Docket Nos. 2194-64, 2195-64, 2480-64 - 2482-64. United States Tax Court
T.C. Memo 1967-39; 1967 Tax Ct. Memo LEXIS 225; 26 T.C.M. (CCH) 191; T.C.M. (RIA) 67039; 26 Oil & Gas Rep. 120; February 28, 1967
Alvin D. Lurie and Daniel Jacobson, 500 Fifth Ave., New York, N. Y., for the petitioners. William F. Chapman, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent has determined the following deficiencies in the income tax of the petitioners for the year 1960: Dkt. No.
Petitioner
Deficiency
2194-64
L. Lee Stanton and Helen
La Fetra Stanton
$18,275.06
[2] 2195-64 Sander Landfield and Frieda
Landfield
6,555.98
2480-64
Bernhardt P. Schmeil and
Florence Schmeil
26,443.48
2481-64
Harold W. Carhart and Dixie
T. Carhart
33,297.67
2482-64
Charles H. Thieriot
33,024.38 These cases were consolidated for trial and opinion because they present common *227 issues as to the deductibility of oil losses incurred by petitioners Stanton, Schmeil, Carhart and Thieriot, and because Docket Nos. 2480-64 and 2481-64 present the same charitable contribution issue. On opening statement the respondent made partial concessions on the oil losses issue as follows: Amount
Allowed
Amount
Amount
Dkt.
per Statutory
Claimed
Now
No.
Notice
per Petition
Allowed
2194-64
$26,761.25
$42,546.00
$32,453.50
2480-64
27,753.35
41,811.44
31,718.44
2481-64
24,174.86
36,147.35
28,890.35
2482-64
29,038.78
46,160.88
33,231.88
Numerous issues raised in the deficiency notices have been settled by agreement of the parties, leaving for our consideration only two: (1) What is the amount of intangible drilling expenses deductible by the petitioners on certain oil and gas wells; and (2) what is the fair market value of fractional interests in various oil and gas wells donated to charitable organizations in 1960? Findings of Fact Some of the facts have been stipulated, and they are incorporated herein by this reference. L. Lee Stanton and Helen La Fetra Stanton, husband and wife, Bernhardt P. Schmeil and Florence Schmeil, *228 husband and wife, and Harold W. Carhart and Dixie T. Carhart, husband and wife, filed joint Federal income tax returns for the calendar year 1960 with the director of internal revenue, Manhattan district, New York, New York. Charles H. Thieriot filed an individual Federal income tax return for the calendar year 1960 with the director of internal revenue, Manhattan district, New York, New York. L. Lee Stanton, Bernhardt P. Schmeil, Harold W. Carhart, and Charles H. Thieriot will sometimes hereinafter be referred to as the petitioners, or individually as Stanton, Schmeil, Carhart, and Thieriot. The petitioners are stockholders and partners in the firm of Carlisle & Jacquelin, odd-lot dealers on the New York Stock Exchange. The petitioners participated in 1960 in drilling oil and gas wells promoted by Barnwell Production Company (hereinafter called Barnwell), a partnership composed of R. S. Barnwell, Sr., and R. S. Barnwell, Jr., of Shreveport, Louisiana. The petitioners were experienced and astute oil investors and were generally familiar with drilling costs and the prices of fractional working interests for oil ventures offered to New York investors in 1960. Thieriot, alone, has *229 participated in drilling nearly 200 wells with ten different operators over a period of 15 years. During 1960 each petitioner entered into separate written agreements (hereinafter sometimes called participation agreements) with Barnwell under which they acquired from Barnwell fractional working interests in oil and gas leases. These agreements also provided that each petitioner would pay Barnwell a fixed sum as his share of the cost of drilling a well at a designated location to a specified depth. Each petitioner further promised to pay his share of the cost of completing and readying for commercial production any well which proved to be successful. The agreements stated separately the price of a full working interest, the full drilling cost, the percentage participation of each petitioner, the cost to each petitioner of his fractional working interest and his share of the drilling cost. The petitioners were particularly interested in participating in the ventures because Barnwell offered them a "turnkey" type of drilling contract. Under a turnkey contract an independent drilling contractor agrees, for a fixed price, to furnish all materials and labor and to do all work required *230 to complete a well, place it on production, and turn it over ready to "turn the key" and start the oil running into tanks. The particular contracts offered the petitioners are known in the industry as "turnkey to the casing point" contracts. "Casing" refers to heavy steel pipe used to seal off fluids from the hole or to keep the hole from caving in. There may be several so-called "strings" of casing, one inside the other, in a single well. The "production string" serves as a conduit to the surface for produced oil. Most producing wells are completed by the setting of casing. "Casing point" refers to the point in time when Barnwell, having drilled to the agreed depth, was to make a decision whether to set casing in place. An affirmative decision reflected Barnwell's judgment that the well had a chance of being a producer. Under the agreements in the instant case Barnwell agreed for a fixed price to do all the work and furnish all the materials necessary to drill a hole to the agreed depth, assuming all risks of fire, blowout, lost bits, etc., without additional expense to the petitioners. The cost of setting casing was treated as a completion cost and billed to petitioners separately *231 from the fixed turnkey drilling cost. The petitioners would not have entered into these drilling agreements with Barnwell without the turnkey guarantee, and they were willing to pay a substantial premium for this feature. The petitioners particularly valued Barnwell's turnkey guarantee because they believed Barnwell to be, and it was, a financially responsible concern with a net worth in excess of one million dollars. The petitioners also looked to Barnwell to provide management, and they were willing to pay a premium for this. Since they were remote investors, living in New York, they considered it essential to have a reliable and skillful contractor managing and supervising these drilling ventures. They did not consider themselves competent to select leases, decide upon drilling sites, oversee operations, and make and implement the decisions required of the contractor, such as deciding on the type of rigs, size of hole, kind of "muds" (i.e., chemical lubricants), and number of tests. The drilling cost admittedly included a premium for Barnwell's management function. Barnwell's attorney and financial consultant, Morton H. Kinzler, discussed these drilling agreements with the *232 petitioners. The petitioners expected to pay more for these agreements than the direct cost to Barnwell of having the wells drilled. However, in some cases where the cost of the drilling or the cost of the working interest seemed too high, the petitioners questioned Kinzler about it, and they rejected several agreements which Barnwell offered to them. In fixing the contract price to cover the drilling expenses, Barnwell first estimated its direct intangible drilling costs, then added an amount for its management overhead, a risk factor to cover the hazards insured against by the turnkey guarantee, a profit factor, and a commission factor to cover the promotional expenses involved in selling fractional interests in individual wells to New York investors. Barnwell along with the petitioners owned fractional interests in the wells in controversy, and it paid its proportionate part of the direct intangible drilling costs and completion costs. Each of the petitioners acquired his interests in the wells involved in this case subject to an operating agreement between Barnwell and Barnwell Drilling Company, Inc. (hereinafter called Barnwell Drilling) covering the development and operation *233 of these wells. The stock of Barnwell Drilling is owned by R. S. Barnwell, Sr., and R. S. Barnwell, Jr. The operating agreement gave each petitioner the right to participate in drilling offset wells. An offset well is a well drilled on acreage adjoining a producing well. Four of the wells as to which respondent has disallowed portions of amounts claimed as intangible drilling expenses are offset wells. Each participation agreement authorized Barnwell to enter into a drilling contract suitable to it with Barnwell Drilling. The actual work of drilling all but one of the wells in issue was done by Barnwell Drilling pursuant to such contracts. Barnwell acquired its rights to all but two of the leases in question under so-called "farmout agreements." Under such an agreement the owner of a lease, not desirous of drilling at the time, agrees to assign the lease or some portion of it to another operator who is desirous of drilling on the tract. The assignor may or may not retain an overriding royalty. The primary characteristic of the farmout is the obligation of the assignee to drill on the assigned acreage or forfeit his interest. In the instant case, Barnwell's assignors generally *234 retained an overriding royalty and Barnwell obligated itself to drill within 15 to 90 days. In effect, Barnwell bought lease interests at wholesale and sold them at retail, financing the drilling obligation, on which its wholesale purchase was conditioned, with funds provided specifically to cover such costs by the retail purchasers of working interests. It is stipulated that the holders of the working interest for each well constituted a separate unincorporated organization, and that the parties made timely elections under section 761(a) of the Code, to exclude these organizations from the application of subchapter K of chapter 1 of subtitle A of the Code. [3] It is also stipulated that the petitioners also made timely elections to claim intangible drilling and development costs as a current expense in accordance with the applicable regulations. For the year in issue, each petitioner claimed a deduction for intangible drilling expenses in the exact amount of the drilling costs set out in the participation agreements, plus the completion expenses. Respondent has made no adjustments with respect to completion expenses. *235 Petitioner Carhart made valid and complete assignments and contributions of fractional working interests in nine oil and gas wells during 1960 to the Roosevelt Hospital, New York. Petitioner Schmeil made valid and complete assignments and contributions of fractional working interests in seven of the same wells to the Delbarton School, Morristown, New Jersey. Roosevelt Hospital and Delbarton School were organizations to which qualifying charitable contributions could have been made in 1960 within the meaning of section 170(c) of the 1954 Code. The amount of such contributions claimed by the petitioners, Carhart and Schmeil, in 1960 did not exceed the limitations set forth in section 170(b) of the 1954 Code. Carhart and Schmeil each contributed the same percentage interests in the seven wells that are common to both cases. Carhart and Schmeil claimed charitable deductions for their gifts of $39,248.83 and $33,919.52, respectively. The deficiency notices allowed such deductions to the extent of $15,698.73 for Carhart and $13,567.81 for Schmeil. At trial respondent asserted that such deductions should have been allowed only to the extent of $13,609.19 for Carhart and $11,493.36 *236 for Schmeil. Opinion It may serve to put the issues in this case in perspective by noting that petitioners Carhart and Schmeil were making money by giving it away. The taxpayers in both those cases had adjusted gross incomes between $200,000 and $300,000. They were able to save more in taxes by contributing portions of their interests in oil and gas wells to charity than they would have been able to net after taxes had they retained their interests or sold them. [4]
The measure of the petitioners' charitable deduction was the fair market value of the interest contributed. At the same time, by virtue of the option to *237 deduct intangible drilling and development costs as expenses, they were able to deduct currently most of the expenses associated with drilling these same wells. The respondent has explicitly sanctioned this plan to take advantage of a double deduction. Rev. Rul. 59-196, 1959-1 C.B. 56. Petitioners claimed deductions for amounts paid to Barnwell for its promise to drill wells at specified sites on a "turnkey" contract, to the casing point basis. Where the wells were successful petitioners also deducted the amounts paid to Barnwell to cover the cost of preparing the wells for commercial production. Such deductions, inter alia, produced net losses on oil ventures for each of the petitioners for the year in issue. The statutory deficiency notices issued in these dockets proposed a disallowance in respect of "oil losses" as recommended per valuation engineer's report." A copy of the engineer's report was not attached to the notices, and the notices did not specify the items or even the general classification of items making up the disallowances. The engineer's report was made available to the petitioners for the first time at trial. Consequently, we ruled at the trial *238 that any specification thereon would comprise new matter upon which the respondent would have the burden of proof. The respondent disputed this ruling at the trial, and he renewed his objection on brief. We need not review the merits of this ruling because we think that the petitioners have affirmatively proved their right to the full amount of the deductions regardless of the burden of proof. Each participation agreement stated separately the cost to that petitioner of the working (or lease) interest and of the drilling expense. For example, the contracts relating to Well #266 states [state] that the full working interest and drilling costs of the well are $35,000 and $95,000, respectively. Each petitioner had a two percent interest in the well and the contract of each petitioner contains the following schedule: Dry Hole Cost (Total
Percentage
Working
Drilling
Working Interest
Participation
Interest
Cost
and Drilling Cost)
2
$700.00
$1,900.00
$2,600.00 The petitioners deducted as intangible drilling expense the amount of the "Drilling Cost" plus the completion expenses for the wells in issue. Respondent's position is that the amounts allocated *239 to drilling cost under the contracts were unreasonably high and actually represented, in part, amounts paid for the working interest. It would follow from that position that such amounts should be capitalized as depletable leasehold costs and could not be deducted currently. Since 1917 the regulations have granted taxpayers the option to deduct intangible drilling and development costs as an expense or to capitalize them. [5] The applicable regulations state: Sec. 1.612-4 Charges to capital and to expense in case of oil and gas wells. (a) Option with respect to intangible drilling and development costs. * * * This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas. Such expenditures have for convenience been termed intangible drilling and development costs. * * * Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used - (1) In *240 the drilling, shooting, and cleaning of wells, (2) In such clearing of ground, draining, road making, surveying, and geological works as are necessary in preparation for the drilling of wells, and (3) In the construction of such derricks, tanks, pipelines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas. *241 In general, this opinion applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. * * * The regulations further provide: (c) Nonoptional items distinguished. (1) Capital items: The option * * * does not apply to expenditures by which the taxpayer acquires tangible property ordinarily considered as having a salvage value. Examples of such items are the costs of the actual materials in those structures which are constructed in the wells and on the property, and the cost of drilling tools, pipe, casing, tubing, tanks, engines, boilers, machines, etc. The option does not apply to any expenditure for wages, fuel, repairs, hauling, supplies, etc., in connection with equipment, facilities, or structures, not incident to or necessary for the drilling of wells, such as structures for storing or treating oil or *242 gas. These are capital items and are returnable through depreciation. (2) Expense items: Expenditures which must be charged off as expense, regardless of the option provided by this section, are those for labor, fuel, repairs, hauling, supplies, etc., in connection with the operation of the wells and of other facilities on the property for the production of oil or gas. The expenditures within the option would quite clearly be capital expenditures in other industries. In the construction of buildings or the erection of surface improvements, for example, expenditures for preparing the site, erecting the building or improvement, and preparing it for its intended use or occupancy are capital expenditures. [6]
The regulations apply to intangible drilling and development costs "incurred by an operator." An operator, according to the regulations, is "one who holds a working * * * interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights." The regulations also provide that expenditures covered *243 by the option "include the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts." Section 1.612-4(a), Income Tax Regs.
Under prior case law amounts paid under turnkey drilling contracts were not deductible as intangible drilling expenses on the theory that when a taxpayer paid only for a completed oil well, he was purchasing a capital asset. See Old Farmers Oil Co., 12 B.T.A. 203 (1928); J. K. Hughes Oil Co. v. Bass, 62 F. 2d 176 (C.A. 5, 1932); and cf. Retsal Drilling Co. v. Commissioner, 127 F. 2d 355 (C.A. 5, 1942). The language of the regulations follows: (Sec. 1.612-4(a)) Included in this option are all costs of drilling and development undertaken (directly or through a contract) by an operator of an oil and gas property whether incurred by him prior or subsequent to the formal grant or assignment to him of operating rights (a leasehold interest, or other form of operating rights, or working interest); except that in any case where any drilling or development project is undertaken for the grant or assignment of *244 a fraction of the operating rights, only that part of the costs thereof which is attributable to such fractional interest is within this option. In the excepted cases, costs of the project undertaken, including depreciable equipment furnished, to the extent allocable to fractions of the operating rights held by others, must be capitalized as the depletable capital cost of the fractional interest thus acquired. The respondent cites the quoted language, but we think it provides no support for respondent's argument in the instant case. The quoted language came into the regulations in 1943 along with the language overcoming the effect of Court decisions denying deductibility to amounts paid under turnkey contracts. [7] Prior to 1943 the courts had uniformly held that where the taxpayer agreed to drill a well to a certain depth in consideration of the assignment to it of an interest in the lease, it acquired an interest in the lease and in the well by the expenditure of drilling costs and, therefore, all such costs should be capitalized as the cost to it of its interest in the producing leasehold. Such an arrangement is known in the industry as "drilling for an interest." The 1943 amendment *245 spelled out the position of the Treasury on this practice and represented a partial surrender by the Treasury of its victories in the cases. [8]
In the instant case, petitioners did not agree to do the drilling; Barnwell did. Thus, petitioners argue, the quoted language from the regulations does not apply. We need not decide to what extent the quoted language provides support for the proposition that the holder of a fractional interest is entitled to deduct drilling costs only in proportion to his interest. Cf. Sidney Platt, 18 T.C. 1229, 1233 (1952). Respondent does not argue that the arrangements in issue were designed to provide a "free ride" for Barnwell with respect to its share of the drilling cost. [9] On the contrary, respondent's own proof goes to establish that Barnwell paid its own share of the direct drilling costs. *246 Respondent's argument is that amounts allocated under the contracts to drilling cost were actually paid for the working interest. The record proves otherwise. The participation agreement stated separately the cost of acquiring the working interest and the cost of drilling the well. The respondent argues that the parties did not bargain for the component parts of the contract but were only concerned with the total price, and that therefore, respondent should be free to reallocate the elements of the contract to reflect economic reality. Cf. Copperhead Coal Company v. Commissioner, 272 F. 2d 45 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court. Respondent sought to prove that petitioners paid Barnwell unreasonably high amounts for drilling the wells. [10] Primarily, respondent rested his contention on figures contained in a publication called "Joint Association Survey of Industry Drilling Costs 1960," which was said to show average drilling costs in various areas. The sponsors of the publication were listed as American Petroleum Institute, Independent Petroleum Association of America, and Mid-Continent Oil & Gas Association. At trial we ruled that such *247 publication was inadmissible to prove the truth of its contents. Nothing has been said on brief that has influenced us to reconsider such ruling. There was no sufficient basis from which we might have taken judicial notice of the reliability of such publication as authority. Nor did respondent elicit testimony as to the reliability of the publication as authority from a witness expert in the field. Respondent also introduced schedules showing the intangible drilling expenses claimed by Barnwell, a co-participant with the petitioners in these wells. They were considerably lower than those deducted by petitioners. The petitioners do not dispute the accuracy of these schedules, but they do question their relevance. The price petitioners paid to Barnwell included allowances for Barnwell's overhead and its management function, insurance against the risks covered by the turnkey guarantee, and a profit factor. In G. F. Hedges, Jr., 41 T.C. 695 (1964), the petitioners paid a drilling contractor a fixed amount and he, in turn, subcontracted *248 the work for a lesser amount. Petitioners deducted the full amount paid the contractor. The Commissioner argued that the difference between the amount paid the contractor and the actual cost to the subcontractor was not deductible as a drilling expense. We rejected that contention and allowed the petitioners a deduction from the full amount paid the contractor, saying, at pp. 700-701: The fact that the promoter-operators were able to subcontract the work of actually cutting the hole in the ground for less than the amounts they received from the working interests does not limit the drilling and development costs undertaken by the partnership to the amounts paid to the subcontractors. If they contracted to pay independent contractors a fixed amount for drilling the wells and preparing them for production, and paid that amount under the contracts, the amounts so paid were drilling and development expenses to them. The fact that the drilling contractors made a profit on the contracts would not change the situation. * * * We think Hedges makes it clear that the full amounts paid by petitioners to Barnwell were deductible, notwithstanding the fact that the actual cost to Barnwell was *249 less than that charged petitioners. Walter Reggin, a petroleum engineer employed by the Internal Revenue Service, made the recommendations that led to the deficiencies asserted in these cases. Reggin's testimony at trial demonstrated a lack of first-hand knowledge of the specific areas where the wells in issue were drilled and of other factors that would have been relevant in arriving at an opinion as to the reasonableness of drilling costs. His secondary knowledge appeared to be based largely on the Survey of Industry Drilling Costs mentioned above. Reggin admitted that average cost figures were of limited relevance in making a judgment as to reasonable, actual costs for the specific wells in issue. William G. Snoddy, a petroleum engineer from Jackson, Mississippi, testified for respondent as to reasonable drilling costs in the McComb field in Mississippi. Two of the wells in issue were drilled in the McComb field. Snoddy testified that the actual cost of drilling a well in the McComb field to 11,100 feet, which was about the depth agreed upon by petitioners and Barnwell, would be about $65,000. Snoddy's testimony was opposed on several points by that of witnesses for the *250 petitioners. His experience was limited. He had never himself assumed the role of turnkey guarantor. Considering the entire record, we have concluded that petitioners have proved that they were entitled to the full amounts claimed as deductions for intangible drilling expenses. Petitioners' evidence was of three kinds. First, they sought to show that the amounts assigned to payment for working interests were reasonable in relation to the fair market value of such interests. Second, they sought to demonstrate the manner in which the figure assigned to drilling cost was derived, and that it was reasonable. This was done in order to explain why that figure was in every case considerably higher than the direct intangible drilling cost to Barnwell. Finally, the petitioners sought to prove that they were experienced oil and gas investors who bargained at arm's length with Barnwell over both the total price of the deals and its components. These lines of proof were intended to, and did show that the allocation under the contracts between drilling cost and working interest was not artificial and was reasonable. Barnwell's object was to sell fractional working interests at a substantial *251 profit. Most of the leases in issue were acquired without substantial cash outlay on Barnwell's part. The usual consideration passing from Barnwell to the owners was Barnwell's commitment to drill within a fixed period, plus an overriding royalty. Archie R. Estess, a member of the Louisiana bar, testified for petitioners with respect to the 1960 market value of lease interests in the areas involved. He was experienced in the purchase and sale of lease interests and personally familiar with the particular leases and farmouts in question. His testimony is to the effect that Barnwell charged petitioners a reasonable amount commensurate to the fair market value of the interests, including, of course, an allowance for profit. The weakness of respondent's argument that the amounts assigned to drilling costs were actually paid to acquire working interests is pointed up by respondent's disallowance of portions of drilling costs claimed on offset wells. In these cases petitioners already owned the working interests. If the amounts assigned to drilling costs were unreasonably high they could not be attributed to leasehold costs. Respondent's only argument in these situations is that the *252 amount of the direct drilling cost to Barnwell fixes the limit of the deduction to which petitioners are entitled. For reasons stated earlier, we think the Hedges decision forecloses that argument. Morton H. Kinzler testified in detail for petitioners as to the method by which their claimed figure for drilling cost was arrived at. His explanation impressed us as both through and reasonable. His testimony and that of petitioner Thieriot suggests that such costs were the subject of bargaining between the parties and that Barnwell was under pressure to keep its prices competitive with those of other companies offering similar deals. We recognize that the interests of the parties were not adverse with respect to allocation of the total price between drilling cost and working interest. Nevertheless we are persuaded that petitioners have proved that the allocation under the contracts was reasonable and not artificial. We have therefore concluded that they are entitled to the full amounts claimed as deductions for intangible drilling expenses. The second issue is the determination of the fair market value of the fractional interests in oil and gas properties contributed to charity by *253 petitioners Carhart and Schmeil. These petitioners supported the values claimed by them by submitting, while their returns were under audit, documents on which they had relied in making out their returns. These documents consisted of appraisals of eight of the nine properties by David J. Flesh of Jefferson, Texas, a consulting petroleum geologist, and an appraisal of the ninth by George A. Khoury, Jr., of Shreveport, Louisiana, a petroleum engineer. Each petitioner also submitted a letter from a firm of certified public accountants, Rupert A. Stuart & Company of New Orleans, Louisiana, in which the accountants said they had reviewed the appraisals and on the basis thereof determined the fair market value of the interests donated to charity. The petitioners used the values stated in these letters in making out their returns. Respondent's petroleum engineer, Reggin, studied the Flesh and Khoury appraisals during the audit stage. He was unable, however, to complete his investigation before the statute of limitations expired on the year in issue. When the petitioners refused to waive the statute respondent assessed deficiencies. At trial Reggin admitted that these deficiencies "were *254 estimates based on ratios of claimed to recommended values for similar contributions in the taxpayers' 1959 returns." [11]
Reggin was respondent's main witness on the valuation issue. By the time of trial he had been able to study the Flesh and Khoury appraisals thoroughly and had prepared a written statement which consisted of criticisms of these appraisals and Reggin's own opinion as to the value of the interests involved. Such opinion was based on the assumed accuracy of the data contained in the Flesh and Khoury documents, except where Reggin had rejected such data on the basis of his own general expertise. Petitioners did not introduce the Flesh and Khoury appraisals at trial in support of the values claimed by them. Their only witness was J. W. Jean, Jr., of Shreveport, Louisiana, chief engineer for Barnwell Drilling. Jean submitted a detailed appraisal of the properties in issue based on personal observation of each of them and on data from the files of the Barnwell Drilling's geological *255 department. Petitioners argued at trial and on brief that Reggin should not have been permitted to introduce the written statement prepared by him as his opinion of the value of the properties in issue. They pointed out that the Flesh and Khoury appraisals had not been offered as evidence of the data contained therein. Therefore, petitioners argued, there was no support in the record for an opinion that assumed the accuracy of data contained in such appraisals. In assessing the merits of this argument it is important to understand the theory and content of an appraisal of an oil property by a petroleum engineer. Such an appraisal is usually made in the following manner: (1) an estimate is made of the recoverable oil in barrels or of gas in cubic feet belonging to the interest which is to be valued; (2) the estimated recoverable reserves are multiplied by the current price of oil or gas to determine the expected future gross income; (3) an estimate is made of the expected life of the property; (4) an estimate is made of the expense to be incurred in the operation of the property over its life; (5) the estimated expense is deducted from the estimated gross income to produce the *256 expected future net operating income over the life of the property; (6) the salvage value which will be realized from the equipment on abandonment of the property is determined and added to the future net operating income to arrive at the total expected future net income; and (7) the total expected future net income is discounted to arrive at the present value of the future net income to a prospective purchaser, taking into account the risks involved in oil and gas properties. [12]
The most elusive piece of datum in the appraisal is the estimate of barrels of reserve oil in place. That figure is computed by means of a standard volumetric formula, which was used by the experts on both sides in this case. The figures that go into the formula are derived from the interpretation of geological data, including electric logs, core analyses and drilling reports. Two engineers could make different interpretations from the same data much in the manner that two doctors could make different diagnoses from the same tests and observations. Reggin did not have access to the data on which Flesh and Khoury based their interpretations. *257 For example, two elements of the formula for determining oil reserves in place are sand thickness and drainage area. The figure assigned to each of these elements represents a conclusion based on the interpretation of geological data. As to both items, Reggins accepted Flesh's conclusions in almost all cases. At trial we refused to disqualify Reggin altogether from giving an opinion as to value, saying that petitioners' objections went to the weight to be given Reggin's testimony. There is evidence in the record that many of Flesh's interpretations were in error. To some extent Reggin was able to avoid incorporating Flesh's errors into his own calculations. On balance, having reviewed the record, we are now of the view that Reggin's opinion as embodied in the written statement submitted by him should be given little weight in determining the value of the properties in issue. Respondent also called a second petroleum engineer, William G. Snoddy, for the purpose of introducing an appraisal by him of three of the wells in issue and to rebut the evidence of petitioners' witness, J. W. Jean, Jr. Petitioners also objected to Snoddy's competence, but we are convinced that those objections *258 are not well taken. The opinions of Reggin, Snoddy and Jean and the amounts originally claimed by petitioners may be compared by means of the following table: Amount
Well
Claimed
Reggin
Snoddy
Jean
[13] 248 $ 2,520.79
$ 1,007.54
$ 2,675.70
249
6,396.39
1,453.54
$ 2,700.00
3,234.81
[13] 250 2,808.52
1,108.29
3,167.26
255
4,987.33
1,277.76
1,735.00
3,439.55
257
4,307.70
1,874.70
3,471.46
258
7,825.65
4,212.07
10,570.00
7,977.01
259
3,120.28
498.30
1,875.79
260
2,373.67
1,051.08
3,229.47
266
4,908.50
1,125.91
10,569.23
Total
$39,248.83
$13,609.19
$39,640.28
The general approach of Reggin and Snoddy differed from that of Jean in the manner in which the former took account of the risk inherent in an investment in oil and gas property. Reggin and Snoddy both testified that in addition to a discount to determine the present worth of future income, the estimated net income should also be discounted by a factor of about one-third *259 to take risk into account. Jean applied no risk discount as such, but stated that his other calculations had been kept very conservative in order to account for the risk factor. Market value of property of the type here involved is defined by the regulations to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170-1(c), Income Tax Regs. In view of the uncertainties involved in the recovery of oil and gas over a period of time it seems clear that fair market value could not be the same as the present value of estimated net revenue. The buyer would certainly seek some profit on his investment commensurate with the risk involved. Petitioners argue that a discount not based on a consideration of the facts and circumstances relative to risk for each particular property is arbitrary and unreliable. We agree that the risk factor ideally should reflect the actual risks involved for each particular property. *260 Cf. Sec. 1.611-2(e)(4), Income Tax Regs. However, petitioners have not proved that the appraisal submitted on their behalf by Jean makes any allowance at all for risk. There is substantial authority, based on industry practice, for the factor urged by respondent's witnesses. We have therefore concluded that the values advanced by petitioners' witness, Jean, should be reduced by one-third to reflect an allowance for risk. On brief respondent sought to have the Snoddy appraisal reduced on the ground that a comparison between Snoddy's testimony and the appraisal submitted by him revealed "a mathematical error" in the latter document. There is not the slightest hint in Snoddy's testimony that he did not stand behind the figures given in his appraisal. In fact, all of his testimony, including that on which respondent relies in support of the change suggested, was given to support the values as listed. In light of such testimony we do not believe we should tamper with the appraisal as offered. Respondent is not being candid when he says the change he proposes has to do with mathematical error. Respondent is really saying that although Snoddy said he discounted *261 for a risk factor he actually neglected to do so. If this were true it would tend to disparage the overall reliability of the Snoddy appraisal in our view. That disparagement would about balance off any gain to respondent from the lower estimates that would be produced by the change suggested. The examination and cross-examination of experts on both sides elicited extremely technical testimony, much of it designed to point up flaws in the interpretations of geological data. Respondent has made lengthy and detailed technical arguments on brief designed to discredit Jean's appraisal. Petitioners have responded with equally technical defenses and counter-arguments. As noted earlier, the Jean appraisals should be reduced one-third to allow for a risk factor. Beyond that, we believe that Jean probably did err on the side of generosity. Taking these factors into consideration and weighing against them the weak nature of respondent's affirmative evidence as to value, we are of the view that substantial justice will be done between the parties by reducing the Jean appraisals by 40 percent and allowing the petitioners charitable deductions based upon that amount. Cohan v. Commissioner, 39 F. 2d 540 *262 (C.A. 2, 1930). We therefore find that the fair market value of the interests contributed by petitioner Carhart to be $23,784.17 and that of the interests contributed by petitioner Schmeil to be $20,278.39. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Sander Lanfield and Frieda Landfield, Docket No. 2195-64; Bernhardt P. Schmeil and Florence Schmeil, Docket No. 2480-64; Harold W. Carhart and Dixie T. Carhart, Docket No. 2481-64; and Charles H. Thieriot, Docket No. 2482-64.↩
2. No issue remains for trial in Docket No. 2195-64 because of a stipulation of the parties.↩
3. All references are to the Internal Revenue Code of 1954.↩
4. Cf. Surrey and Warren, Federal Income Taxation: Cases and Materials, (1960 edition with 1961 supplement integrated), pp. 322-323. If a taxpayer exercises the option to expense intangible drilling and development costs and later sells the properties in connection with which such intangibles have been incurred, he cannot include those costs in his basis. Continental Oil Co. v. Jones, 177 F. 2d 508 (C.A. 10, 1949), Ramsey v. Commissioner, 66 F. 2d 316 (C.A. 10, 1933), Fort Ring Oil and Gas Co., 30 B.T.A. 307↩ (1934).
5. The Fifth Circuit, in F.H.E. Oil Co. v. Commissioner, 147 F. 2d 1002 (C.A. 5, 1945), held that the basic concept of giving the taxpayer such an option was contrary to law. Congress responded to that decision by adopting a resolution stating that it "recognized and approved" the regulations granting the option. House Concurrent Resolution 50 (79th Cong., 1st Sess.). No court followed the Fifth Circuit, and the Commissioner never attempted to deny the use of the option on the ground of its invalidity. The 1954 Code removed any doubt as to the validity of the option by providing in section 263(c) that the Secretary or his delegate is authorized to prescribe regulations under the 1954 Code "corresponding to the regulations which * * * were recognized and approved by the Congress in House Concurrent Resolution 50, Seventyninth Congress." Pursuant to that section the Treasury twice proposed regulations which were later withdrawn. See Prop. Treas. Reg. 1.612-4, 21 Fed. Reg. 8446 (Nov. 3, 1956), and Prop. Treas. Reg. 1.612-4, 25 Fed. Reg. 3761 (April 29, 1960). On July 15, 1965, regulations were promulgated, which were in substance the same as those that had been in effect since 1943. Cf. sec. 39.23(m)-16, Regs. 118, with sec. 1.612-4, Income Tax Regs. The new regulations were made applicable to all taxable years beginning after December 31, 1953, see 1965-2 C.B. 182↩, and therefore govern this case.
6. See Blum, "How To Get All (But All) The Tax Advantages Of Dabbling In Oil." 31 Taxes 343↩, 345 (1953).
7. See T.D. 5276, 1943 C.B. 151↩. 8. See generally Coughlin, "Treatment Of Dry Hole Costs On Acquisition Well Attempts," IX Oil And Gas Tax Quarterly 89 (1960); Mahin, "Deduction For Intangibles," 2nd Annual Institute On Oil And Gas Law And Taxation of the Southwestern Legal Foundation, 367, 397-398 (1951).↩
9. See Miller, Oil And Gas Federal Income Taxation (1966), pp. 270-271.↩
10. However, respondent made no attempt to show that amounts allocated to payment for the working interests were unreasonably low.↩
11. The necessity for issuing notices of deficiency before the statute ran was also advanced to justify the uninformative nature of such notices with respect to the drilling expense issue.↩
12. Fiske, Federal Taxation Of Oil And Gas Transactions (1965), p. 166.↩
13. Petitioner Schmeil had no interest in these two wells, consequently his total amount claimed was $33,919.52 and Jean's appraisals of his interests totaled $33,797.32.↩