EARL HIGHTOWER and PATRICIA HIGHTOWER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Hightower v. Commissioner
Docket No. 2042-70
United States Tax Court
T.C. Memo 1972-252; 1972 Tax Ct. Memo LEXIS 3; 31 T.C.M. (CCH) 1250; T.C.M. (RIA) 72252; 44 Oil & Gas Rep. 277; December 26, 1972, Filed Earl Hightower, pro se. Marion Malone, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes in the amounts of $2,410.43 and $5,128.28 for the calendar years 1966 and 1967, respectively. The issue for decision *4 is the fair market value of a 5 percent working interest in certain oil and gas leases donated by petitioners to a tax exempt, educational institution. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Earl and Patricia Hightower, are husband and wife whose legal residence was in the State of California at the time of the filing of the petition herein. Earl Hightower (hereinafter referred to as petitioner) is engaged in the practice of law and also has interests in oil and gas exploration and production. Petitioner maintains his office in Los Angeles, California. Petitioners keep their records and file their Federal income tax returns on the cash method of accounting and on a calendar year basis. Petitioners filed joint Federal income tax returns for the calendar years 1966 and 1967 with the Western Service Center at Ogden, Utah. In 1960, James Drilling Corporation obtained 11 oil and gas leases from landowners in Crawford County, Pennsylvania. The leases reserved to the landowners a one-eighth interest in the gross amount of any oil and gas produced and sold from the leases. The landowners' names and the acreage involved were *5 as follows: A. Robert M. Schlosser Unit (1) Robert M. and Charlotte Schlosser 120 acres (2) Edward F. and Mabel I. Parsons 70 acres 190 acres B. Mervin A. Price Unit (1) Mervin A. and Caroline Price 89 acres (2) Frank and Mary K. Knapp 115 acres 204 acres C. Leonard L. Humes Unit (1) Leonard L. and Joanna S. Humes 50 acres (2) Carl D. Main and J. T. Crawford 121 acres (3) Carl D. and Sylvia C. Reichel 50 acres (4) Arthur H. and Jean K. Reichel 41 acres 262 acres D. Burnette M. Hansen Unit (1) Burnette M. and Ruth E. Hansen 62 acres (2) Thomas R. Acker 74 acres (3) Malvin W. Newhard and Cecile M. Newhard 22 acres 158 acres In December 1963 petitioners acquired an undivided one-twentieth working interest in the above oil and gas leases, by mesne assignments of record, subject to at that time a total landowners' and overriding royalty of 25 percent, leaving a net 75 percent to the working interest owners. Sometime during 1962, Transamerican Petroleum Corporation drilled a well designated as Kastle #1 Well in Crawford County, Pennsylvania. On October 1, 1962, the well was completed as a shut-in gas well with an initial potential production of 1,399,000 *6 cubic feet of gas per day. This well was located in the general area but was not situated on any of the leases in which petitioners owned an interest. This well was the first of 50 wells completed in the Kastle field in Crawford County, Pennsylvania by 1965. There are no specific requirements for the spacing of wells in the Commonwealth of Pennsylvania and spacing ranged from 320 to 80 acres per well in the Kastle field. However, the distribution of wells in the field suggested an attempt to maintain spacing of approximately 160 acres per well. Beginning in December 1963 petitioners and others drilled the following wells: (a) Schlosser #1 Well on the Robert M. Schlosser Unit to a depth of 4,306 feet, which well was completed on December 26, 1963, as a shut-in gas well. (b) Price #1 Well on the Mervin A. Price Unit to a depth of 4,330 feet which well was completed on January 28, 1964 as a shut-in gas well. (c) Humes #1 Well on the Leonard L. Humes Unit to a depth of 4,035 feet, which well was completed on February 10, 1964 as a shut-in gas well. (d) Hansen #1 Well on the Burnette M. Hansen Unit to a depth of 4,170 feet, which well was completed on February 11, 1964 as a *7 shut-in gas well. Petitioner's proportionate share of the cost of drilling each of these wells was $3,750. Petitioner learned of and was presented with the opportunity to participate in the oil and gas leases through several individuals in Denver, Colorado who operated under the name of Ventura Oil Company (hereinafter referred to as Ventura). Petitioner had no part in the management or operation of the leases, this function being performed by Ventura. Wayne C. Granger (hereinafter referred to as Granger), a geologist and petroleum engineer, worked as a consulting engineer for Ventura in the western Pennsylvania area. Granger supervised the drilling of approximately 50 wells for Ventura in the western Pennsylvania area, including the 4 wells drilled by petitioners and others. These wells were rotary drilled with air. Electric logs were made to determine the location of the pay zones. Casing was set in cement through the pay zones and perforated at locations selected from the electric logs. The wells were cleaned with detergent, gauged for inital potential daily production and a wellhead placed on them with all necessary connections to be hooked up to a pipeline. All of the *8 wells remained shut-in awaiting the completion of a gas gathering system. Granger prepared an evaluation report in May 1964 which estimated the gas reserves in the ground for several gas wells including the four wells in which petitioners had an interest. At the time of his evaluation, Granger did not have the benefit of any productive history and so in evaluating the gas reserves in the wells, he used the volumetric method of estimating reserves. In making his evaluation, Granger relied on his electric logs, core analysis, sand thickness, water content, and the reports of other engineers in the area. Granger estimated the recoverable gas of the four wells to be as follows: Well designation
Recoverable gas
Schlosser #1
850,291,200 cubic feet
Price #1
972,886,464 cubic feet
Humes #1
1,045,230,000 cubic feet
Hansen #1
789,307,000 cubic feet In the evaluation report on Price #1, Granger estimated that there were recoverable oil reserves of 13,115 barrels of oil in addition to the recoverable gas reserves. In November 1968 the Humes #1 Well was hooked up to a gas gathering system and its first 6 months of production was as follows: Month
Quantity in MCF
Gross amount
December 1968
19,608
$4,902.00
January 1969
11,168
2,792.00
February 1969
11,391
2,847.75
March 1969
8,364
2,091.00
April 1969
5,540
1,385.00
May 1969
5,340
1,335.00
*9 The total gross receipts for the first 6 months of production was $15,352.75 of which amount $11,514.56 or 75 percent was allocable to the working interest. On or about December 30, 1966, petitioners made a gift of their undivided one-twentieth working interest in the four drilling units upon which the Schlosser #1, Price #1, Humes #1, and Hansen #1 wells were located to Webb School of California, a tax-exempt nonprofit corporation located at Claremont, California. This assignment constituted a gift to Webb School and petitioners claimed a charitable deduction in the amount of $35,189.40 on their return for the calendar year 1966. Since petitioners' total charitable contributions as claimed on their 1966 income tax return exceeded 30 percent of their adjusted gross income, petitioners on their 1967 return claimed a carryover of charitable contributions deduction of $20,818.63. Respondent in his notice of deficiency determined that petitioners were entitled to deduct as a charitable contribution for the oil and gas interests donated to the Webb School the amount of $8,400. On the basis of this determination of respondent, petitioners' charitable contributions in 1966 did not exceed *10 30 percent of their adjusted gross income in that year and respondent therefore disallowed the contributions carryover from 1966 claimed by petitioners on their 1967 income tax return. OPINION Section 170(a), I.R.C. 1954, allows a deduction for a charitable contribution made within the taxable year to an organization specified in section 170(c). [1] *11 The parties agree that the Webb School is an organization qualified under section 170(c) and that the fair market value of the property contributed by petitioners to the Webb School constitutes a deductible contribution. While Granger's estimates of the potential gas reserves present in the four properties are only estimates and may be on the optimistic or generous side, they do in our view reasonably reflect the volume of gas to use as a starting point in determining the fair market value of the wells. The evaluation report prepared by Granger in May 1964 contemplates a recovery period of 10 years. However, Granger testified at the trial that a recovery period of 20 years would be more realistic. Respondent's expert witness, James *12 F. Shea, was also of the opinion that a recovery period of 20 years would be reasonable. The prevailing price of gas from the Kastle field in 1966 was 28-1/2 cents per MCF. Granger testified that the price increases which could be anticipated at that time would be one-fourth cent per year. Therefore, the price of the gas would be increased 1 cent every fourth year in computing the gross operating revenue to be received over the recovery period of approximately 20 years. The amount of gross operating revenues from the wells would then have to be reduced by the amount of direct field operating costs, which the evidence shows to be approximately $1,200 per well. Although in making the estimate on their return, petitioners did not use a discount factor to determine the present value of the estimated income from the wells, they acknowledged on brief that such a discount factor is proper since a buyer would discount the amount he would pay for the wells on the basis of the interest cost of the money needed to acquire the wells. Petitioners suggest a 5 or 6 percent interest cost and respondent a 7 percent discount rate. From the evidence in this case it appears that as of December 1966 *13 when petitioners made their gift to the Webb School, a 7 percent interest rate is more realistic than a 5 or 6 percent rate. A computation using the recoverables per well and prices as determined by Granger with a 7 percent discount factor over a 20-year period beginning in 1967 shows the present worth as of December 1966 of petitioners' interests in the four wells to be $23,440. This amount of $23,440 is not, however, in our view the fair market value of petitioners' interests in these four wells as of December 1966. The 7 percent discount merely allows for the interest on a buyer's investment if production were to start with income being received from the wells as of January 1, 1967, and there was no risk of not recovering the full estimated reserves. Any knowledgeable prospective buyer would know that he would not begin obtaining income from the wells for some time after January 1, 1967, and that the estimate of reserves was an estimate. Respondent contends that the present value discounted of petitioners' one-twentieth interest in the 75 percent working interests of the four gas wells should additionally be reduced by a factor for these risks and suggests a one-third discount *14 factor. Petitioner argues that any risk factor is offset as a result of the energy crisis and inflation of values which have occurred over the past decade, and that no discount for risk should be applied herein. We agree with respondent that based on the evidence in this case as of December 1966, a willing buyer would have discounted the estimated present worth of the wells because of the risks involved and a willing seller would have accepted such a discounted price. There are many risks attendant to the recovery of gas over a period of years. To determine the fair market value of an interest in a gas well, the present value of the estimated return from recovery of gas reserves should be discounted to appropriately reflect such risks. [3] The risk factor should reflect the risks attendant to each piece of property, taking into consideration such factors as operating record, if any, comparisons of productivity of adjacent or contiguous properties, and anticipated price changes precipitated by changes in supply and demand or inflationary trends. Taking all of these factors into consideration we are of the view that a discount of between 25 and 30 percent of the present value discounted *15 of the properties is necessary to reflect the risks present in the recovery of the estimated revenue from the four properties herein, and offset an estimate of the potential gas reserves on the part of Granger so as to arrive at a reasonable fair market value of the interests in the four wells given by petitioner to the Webb School.
We conclude that the fair market value in December 1966 of the fractional interests contributed by petitioners to the Webb School was $17,000. We reach this conclusion not only on the basis of the computations we have outlined which support this $17,000 as a reasonable estimate of the amount a willing buyer would pay a willing seller for the interests which were the subject of petitioners' gift but also from a consideration and evaluation of all the evidence of record in this case. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction.-- (1) General rule.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. * * * (c) Charitable Contribution Defined. - For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * * (2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; * * * Section 1.170-1(c)(1), Income Tax Regs., provides: (c) Contribution in property--(1) General rules. If a contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * The burden is of course on petitioner to show error in the amount allowed by respondent as a deduction for property contributed to a charity. However, the fair market value of property which is the subject of a charitable contribution is an issue of fact to be resolved from consideration of all of the relevant evidence of record in the case. Daniel S. McGuire, 44 T.C. 801 (1965). Petitioners' deduction for the contribution to the Webb School in the amount of $35,189.40 was calculated from Granger's projection for the recovery of gas reserves from the 4 gas wells made in May 1964 without any discount factor for the present value of income to be received in the future, or any discount factor for risk. Petitioners offered the expert testimony of Granger in support of these estimated reserves. Granger's testimony was based to a large extent on documents prepared by him or under his supervision at the time the wells were drilled and by the evaluation report prepared by him approximately 5 months after the wells were shut-in, but before production began. In December 1966 when petitioners made the gift of their interests in the 4 wells to the Webb School, no production had been run from any of the wells. Since no gathering lines were available in the field in which these wells were located, it was difficult to estimate when production would begin. Therefore, any purchaser of petitioners' interests in these wells would have to speculate as to when he would begin to receive any return from his investment. Under these facts it is difficult to assess the weight such a prospective purchaser would give to the estimated reserves in the wells times the unit price for gas in determining the amount he would have paid for petitioner's interests in the wells. However, since there is no actual production history of these wells and since there were no sales of any interests in these wells near the time petitioners made their gift to the Webb School, we must either determine the fair market value of petitioners' fractional working interests in the four gas wells by considering the estimated recoverable gas reserves and period of recovery, the price of gas, the operating costs, and the discount to be applied to ascertain the present value and risk factor; or hold that petitioners have failed in their proof. Under the facts here present, we conclude that the evidence of record is sufficient to reasonably establish the fair market value of the interests in the gas wells that petitioners gave to the Webb School and that the evidence supports an amount higher than the amount determined by respondent. Secs. 1.611-2(d)(2) and 1.611-2(e), Income Tax Regs., provide that in determining the fair market value of a mineral property for the purpose of establishing basis "analytical appraisal methods" should not be used if the fair market value can reasonably be determined by any other method. However, if fair market value cannot be determined by any other method, the regulations provide for use of the "present value method" based on listed items including the quantity of minerals expected to be recovered during each operating period, the probable duration of recovery, expected profit, and the rate of interest commensurate with the risk for the particular deposit.
[2]↩
3. See L. Lee Stanton, T.C. Memo. 1967-39↩, where we applied a 40 percent discount to the present worth of the estimated reserves of oil properties to determine the fair market value of the properties.