**ESTATE of Maurice FRANKEL et al., Plaintiffs-Appellants.**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 74–1958.

United States Court of Appeals, Fifth Circuit.

May 8, 1975.

Marvin K. Collie, Carl Estes, II, G. Edward Ellison, Vinson, Elkins, Searles, Connally & Smith, Houston, Tex., for plaintiffs-appellants.

Anthony J. P. Farris, U. S. Atty., Mary L. Sinderson, Asst. U. S. Atty., Houston, Tex., Scott P. Crampton, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Howard A. Weinberger, Tax Div., Dept. of Justice, Dallas, Tex., Meyer Rothwacks, Chief, App. Sec., Ernest J. Brown, Jonathan S. Cohen, Dennis M. Donohue, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before DYER, MORGAN and GEE, Circuit Judges.

DYER, Circuit Judge:

A production payment is the right to receive a specified share of the production from the mineral in place, or its proceeds, if, as and when such production occurs. At his death, Maurice Frankel owned an undivided $^{17}\!/_{96}$ interest in an oil production payment attributable to several Louisiana oil properties. The dispute before us on appeal is whether, for estate tax purposes, this payment should be valued at its full unrecouped face amount or reduced by a factor of 6% per annum to reflect the risks involved in owning such investments. By comparing the production payment to a note and utilizing regulations applicable to such instruments, the district court sustained the Commissioner's determination that the value of the payment was its entire unrecouped principal balance, and denied the estate's claim for refund. However, we find that the analogy employed by the district court was inappropriate in the context in which it was used and induced a clearly erroneous result. We therefore reverse.

On August 1, 1960, Frankel and others conveyed certain oil and gas leases on Louisiana lands to the Berkshire Oil Company, retaining at the time of conveyance a production payment payable out of 70% of the oil production from the properties. This payment, which was to bear interest at the rate of 6% per an-

num from October 1, 1960, had a face value of $8,000,000; Frankel's interest was an undivided $^{17}\!/_{96}$ or $1,416,666.67.

Frankel died on June 27, 1964. In accordance with the then-existing § 2032 of the Internal Revenue Code of 1954, his executors chose to value the estate's assets as of June 27, 1965, one year after Frankel's death.[1] As of that date, the production payment had been reduced by $692,921.23, leaving an unpaid principal balance of $723,735.44.

Following the filing of the estate's tax return, the Commissioner assessed a deficiency against the estate in the amount of $131,980.05 plus interest stemming primarily from the dispute which is the subject matter of this appeal.[2] The estate paid the assessment and filed a timely claim for refund. Following the denial of its claim, this refund suit was instituted in district court.

At trial, it was stipulated that the sole matter in dispute was the fair market value of the production payment as of June 27, 1965. The evidence presented during trial to the court on this issue consisted of the testimony of one expert witness and professional appraisals of the mineral properties subject to the production payment prepared in 1960, 1964, and 1965. These appraisals were unanimous in concluding that the reserves were sufficient to retire an $8,000,000 production payment, but differed as to the date of expected payout. The 1960 report predicted that payout would occur in 1970, while due to an unanticipated slowing of production, the 1965 report concluded that the payment would not be retired until 1976.

The estate also offered the expert testimony of Mr. Gaston, a petroleum engineer who had assisted in the preparation of the 1965 appraisal report. Gaston testified in some detail both as to the un-

certainties involved in estimating the reserves on the specific properties subject to this production payment and to the risks inherent in owning oil and gas properties generally. He further stated his opinion that, based on the 1965 report which he had helped to prepare, the production payment on June 27, 1965, had a fair market value of between $475,000 and $512,000. Gaston explained that he had arrived at this range of values by discounting the unpaid principal balance as of that date, $723,735.44, by a factor of 6% per annum to compensate for "the risks attendant to owning oil and gas properties."

The government presented no witnesses, and rested after cross-examining Gaston and introducing into evidence the 1960 appraisal report which estimated payout in 1970. Taking the matter under submission, the trial court subsequently issued findings of fact and conclusions of law sustaining the Commissioner.

■ All parties agree that the ownership of an oil production payment entails some risks. Since the payment is secured solely by as yet unexploited reserves, the most obvious element of risk is that estimates of sufficient quantities of the mineral to retire the payment will in fact prove inaccurate.[3] However, other risks are involved even when the reserves are apparently sufficient. For example, a number of factors may affect the rate of production, ranging from mechanical failures or acts of God in connection with the wells to the inability or unwillingess of the holder of the working interest to develop the property more quickly. These factors are relevant because a slower rate of production dictates that a larger amount of production will be consumed by interest payments rather than applied to principal. Finally, there are hazards which are un-

---

1. For decedents dying after December 31, 1970, the alternate valuation date for estate assets is six months after death. 26 U.S.C.A. § 2032 (Supp.1975).

2. Certain other items originally contested were conceded by the government prior to trial.

3. A production payment by definition must have an expected economic life shorter than that of the mineral estate it burdens. If the estimates of reserves indicate that the interest will not pay out, it is a royalty interest rather than a production payment. United States v. Morgan, 5 Cir. 1963, 321 F.2d 781.

related to the specific mineral property, such as the risk that the market price for the mineral will decline.[4]

■ Whether these facts justify the "risk discount" contended for by the estate, however, must be determined in the context of the pertinent estate tax regulations, which are binding provided they "implement the congressional mandate in some reasonable manner." United States v. Correll, 1967, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537.

The fundamental principle of valuation established by the estate tax regulations is "fair market value," which is defined as "the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 20.2031–1(b).

■ Two recent Tax Court decisions in our view firmly establish the principle that consideration of risk is an appropriate and perhaps necessary element in valuing oil and gas interests under this standard. In Earl Hightower, 1972, 31 T.C.M. 1250 and L. L. Stanton, 1967, 26 T.C.M. 191, the Tax Court considered the valuation of partial working interests in oil and gas properties for charitable deduction purposes, which under pertinent regulations was to be determined by reference to precisely the same "willing buyer-willing seller" test applicable to estate taxation. In both cases, the government successfully contended that, to ascertain the "fair market value" of the interests as defined in the regulations, the projected future net income from the properties must be discounted to reflect the risk that the full amount of projected income would not be realized.

As the court observed in Stanton, supra, 26 T.C.M. at 200:

Market value of property of the type here involved is defined by the regulations to be "the price at which

the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170–1(c), Income Tax Regs. In view of the uncertainties unvolved in the recovery of oil and gas over a period of time it seems clear that fair market value could not be the same as the present value of estimated net revenue. The buyer would certainly seek some profit on his investment commensurate with the risk involved.

Although in light of the facts and law previously discussed we must conclude that the trial court's finding that "no facts were introduced which established that the value of the production payment was lower either in 1960 or on the alternate valuation date in 1965 than the unpaid balance due" was "clearly erroneous," F.R.C.P. 52(a), we think that the focus of our disagreement with the district court is primarily as to controlling legal principles rather than facts.

While recognizing the relevance of the "willing buyer-willing seller" standard of valuation, the district court explicitly adopted the government's theory that an interest in an oil production payment is for all relevant purposes the functional equivalent of a note owned by the decedent at death. Working from this premise, the court went on to apply the estate tax regulation dealing with valuation of notes, 26 C.F.R. § 20.2031–4, which provides in pertinent part:

The fair market value of notes, secured or unsecured, is presumed to be the amount of unpaid principal, plus interest accrued to the date of death, unless the executor establishes that the value is lower or that the notes are worthless. . . . If not returned at face value, plus accrued interest, satisfactory evidence must be submitted that the note is worth less than the unpaid amount (because of

4. Viewed from the perspective of the current "energy crisis," it is difficult to now see this as a serious concern. However, in 1965 the Interior Department held hearings on the advisa-

bility of continuing the mandatory oil import program which served to support the domestic oil price. 30 Fed.Reg. 1012 (1965).

the interest rate, date of maturity, or other cause), or that the note is uncollectible, either in whole or in part (by reason of the insolvency of the party or parties liable, or for other cause), and that any property pledged or mortgaged as security is insufficient to satisfy the obligation.

The regulations setting forth the "fair market value" standard themselves caution against overbroad application of the regulations governing specific types of property in preference to the general "willing seller-willing buyer" test.[5] The dangers inherent in such an approach becomes apparent in this case, in which we conclude that the net effect of strained analogy was an incorrect result.

As we read § 20.2031–4, it embellishes the "willing buyer-willing seller" test with an assumption that, while generally true with regard to normally encountered varieties of notes, is inaccurate with respect to a production payment. This assumption is that the risk of nonpayment is one of the factors reflected in the rate of interest charged on the note.[6] Once this premise is accepted, it becomes reasonable then to assume, as the regulation does, that the allowance for risk expressed in the note's interest

rate is presumptively adequate and that to justify a further discount, the estate should be required to introduce specific facts showing that the risk factor was inadequately compensated for *ab initio* (possibly because the loan was not negotiated at arm's length), or has become so through intervening circumstances.[7]

■ However, the assumption that the rate of interest carried by a note contains an allowance for risk is itself based on the assumption that, by accepting the note, the lender is assuming risks that he previously did not bear. It is at this point that the analogy between a production payment and a note breaks down. When Frankel transferred his leasehold estate to Berkshire Oil Company, retaining an obligation payable solely out of the production attributable to these leases, he in effect conditioned his right to receive the production payment on almost precisely the same risks, *i. e.* inadequate reserves, unfavorable market conditions, etc., he had borne as owner of the leasehold interest.[8] Since Frankel assumed almost no new risks by retaining the production payment, it follows that we cannot look to the interest rate carried by the production payment to reflect these risks.[9]

5. "The valuation of any property *not specifically described* in §§ 20.2031–2 to 20.2031–8 is made in accordance with the general principles set forth in 20.2031–1." 26 C.F.R. § 20.-2031–9 (emphasis added).

6. The general validity of this principle can be seen in the hierarchy of commercial loan rates, which range upward from the "prime rate" charged the soundest borrowers.

7. Applying these assumptions to the facts before the district court, it is easy to see how that court reached the result it did. Frankel and his partners had accepted a 6% rate of interest as part of a transaction which no one suggested was other than arm's length. Moreover, the estate's expert testified that 6% was a "going rate" of interest for production payments in both 1960 and 1965. Finally, there was no substantial argument that payout of the production payment became less certain between 1960 and 1965, as Gaston also testified that estimates of reserves become more accurate as the fields acquire a production history on which to base projection. If one assumes that the interest rate charged contains an allowance for risk, it becomes obvious that

no further discount would be warranted on these facts.

8. A minor exception is that, by accepting a production payment, Frankel did assume the risk that the transferee of the working interest would be unable or unwilling to develop the property at the anticipated rate. This element of risk is included in the interest rate carried by the payment.

9. Gaston, the estate's expert, testified in some detail to the distinction we have drawn between the interest rate carried by a production payment and its risk factor.

Q. Do you know any facts whatsoever that would establish the six percent did not accurately reflect the risk for the production payment when it was made in 1960?
A. Well, the interest on the production payment has nothing to do with risk, as I mentioned a while ago. The risk would come into a prospective buyer of this production payment who has no other deal involved in this thing other than to buy the production payment.

The theoretical "willing buyer" posited by the regulations, however, stands in a far different position than Frankel. Since he is presumed to be a disinterested outsider with no previous connection to the property, his hypothetical purchase of the production payment would necessarily require the assumption of risks he did not previously bear. Since the interest rate carried by the production payment does not reflect these risks, the "willing buyer" must be compensated by an appropriate discount from face value.[10]

In Bar L Ranch, Inc. v. Phinney, 5 Cir. 1970, 426 F.2d 995, we noted in a different context that

> [i]n determining fair market value . . . commercial realities must be given due consideration. . . . Especially is this so where, as here, testimony shows that the Internal Revenue Service merely assumed, without investigation, that the face value represented the fair market value. Although a valuation at face may be a reasonable starting place, such a valuation will be held to be arbitrary if evidence of commercial realities is introduced which shows that the valuation is clearly excessive. Id. at 1000.

The net effect of the district court's holding here was that a "willing buyer" would purchase an obligation entailing substantial elements of risk to obtain, at some uncertain date in the future, the return of his capital plus a rate of interest comparable to that available on a bond. We think this holding conflicts not only with the commercial realities of the situation, but with the pertinent estate tax regulations governing valuation, as interpreted in *Stanton* and *Hightower*.

We therefore reverse and remand with directions that the Frankel estate's interest in the oil production payment be valued at $512,000.[11]

Reversed and remanded with directions.

---

Now, Mr. Frankel might have made some kind of a side deal, or might have gotten a lot of extra money, cash. We don't know that.

Q. That is just conjecture, is that right?
A. That's right. We don't know that. We can't evaluate that, but what we can evaluate is what an outsider coming in without any other strings attached would give for this production payment at this particular time in evaluating the risk involved and whether he would receive any money back and what return he would receive on that money.
Q. My question, Mr. Gaston, is essentially, is this: Did anything occur in your opinion in 1960 when a production payment was made at *six percent*, and in 1965 when you think *fifteen percent* would have been proper, anything happen in the field that would have caused that increase?
A. No, sir. In fact, I would have said in 1960 anybody buying the production payment would also want fifteen percent return on it.
Q. All right.
A. I did not say six percent was right at one time and six was wrong at another. I think anyone purchasing this production payment at any of those times would have wanted a return over and above six percent on his money for the risk involved. Tr. at 43–45.

His efforts were not completely successful, because the trial court ultimately distinguished his testimony on the grounds that his opinion as to the propriety of a risk discount "conflict[ed]" with his evidence that 6 percent was 'the going rate' for such production payments both in 1960 and 1965."

10. While we think it clear that the district court reached the conclusion which it did because of what we find to be an erroneous view of the nature of a production payment, the government alternatively urges that we affirm on the ground that the estate failed to meet its twin burden of demonstrating that the Commissioner erred in his determination of tax liability and the amount of the error. Crosby v. United States, 5 Cir. 1974, 496 F.2d 1384, 1390. We have considered the arguments advanced in this regard and find them unpersuasive.

11. As the highest valuation figure testified to by the estate's expert, this represents the lowest figure as to which the estate has carried its burden of establishing the correct valuation. *Crosby, supra, n 10.*