The **FORT WORTH NATIONAL BANK,**
**Independent Executor of Estate of**
**Mary Lard, Deceased**
v.
**UNITED STATES of America.**
**Civ. A. No. 4–2130.**

United States District Court,
N. D. Texas,
Fort Worth Division.
Feb. 5, 1975.
Order May 30, 1975.

Richard Lee Brown, Fort Worth, Tex.,
for plaintiff.

Frank McCown, U. S. Atty., William
L. Johnson, Jr., Asst. U. S. Atty., Fort

Worth, Tex., William Guild, Tax Atty., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

MAHON, District Judge.

In this tax refund action tried to the Court, plaintiff as successor Independent Executor of the Estate of Mary Lard seeks the recovery of federal estate taxes paid in the amount of $337,780.00 pursuant to 28 U.S.C. § 1346.

The decedent, a Texas resident died testate on March 5, 1968. Her last will dated August 3, 1966, and two codicils to that will were duly probated. The will and codicils were admitted into evidence. The original testamentary scheme of Mary Lard as reflected in her last will included specific bequests to her sisters, a bequest in trust to two of her grandchildren and the residue of her estate in trust for her husband S. S. Lard with a remainder in trust over to Homer Lard. A residuary trust was also established for any remainder of the Homer Lard trust for the children of Homer Lard's wife. The first codicil, executed August 4, 1966, amended the residuary clause of her last will as it pertained to her estate subsequent to the death of her husband, S. S. Lard. Where in the original will, it was to go in trust to Homer Lard, the entire residue was now to be distributed by various specific bequests with the bulk of her estate to pass to a charity which would qualify as a charitable deduction in determining her net taxable estate for federal estate and state inheritance tax purposes. Also, a significant trust in the amount of $100,000.00 was established as part of the specific bequest of this codicil. These provisions superceded and eliminated any bequest to Homer Lard, his wife, or Homer Lard's wife's children. The assets of Mary Lard's estate total some 1.6 million dollars. The original executor of the Mary Lard Estate, S. S. Lard, timely filed a Federal Estate Tax return which reflected an estate tax due of $135,348.-54. Internal Revenue Service conducted

an audit of said return which resulted in an assertion of a deficiency in the amount of $372,315.03. The audit disallowed the deduction, because *inter alia,* the government determined that Mary Lard's will which established her husband as the life beneficiary of her estate, permitted not just a distribution of income but also a diversion of the corpus through disbursements of royalty proceeds so as to render the charitable remainder interest unascertainable. Alternatively, the government claims that any remainder interest which would pass to charity is incapable of being accurately valued. The estate claims that the will by its provisions in no event allowed any diversion of corpus because there was an ascertainable standard for the exercise of its discretion in disbursing funds. In the alternative, the estate maintains that even if the diversion of royalty proceeds was possible under the will, the charitable remainder was ascertainable, and capable of accurate valuation. The assertion of additional tax by the treasury was protested. After failing to secure an administrative settlement of the asserted deficiency, plaintiff executor was issued the statutory ninety day letter on May 15, 1972. Said letter asserted a deficiency in estate taxes against the estate of Mary Lard in the amount of $372,314.92. Additional estate taxes in the amount of $307,204.39 plus interest in the amount of $54,281.25 were paid to the government under protest on or about May 25, 1972.

Before considering the issues presented, an examination of the pertinent will provisions is necessary. Relevant portions state:

"VI.

(D) The corporate trustee, in determining net income available for distribution, shall consider as income the entire proceeds received in connection with the physical severance of natural resources, whether bonuses, royalties, overriding or limited royalties, oil payments or other similar payments and, notwithstanding the provisions of

Section 33 of the Texas Trust Act, shall not allocate any portion thereof as corpus."

\* \* \* \* \* \*

"VII.

(B) During the lifetime of my husband, S. S. Lard the corporate trustee hereinabove named, whether it be serving as co-trustee or as the sole trustee, *shall in its complete and absolute discretion distribute to and for the benefit of S. S. Lard all of the income of this trust and so much of the corpus as the corporate trustee in its sole discretion determines is appropriate for his needs."* (emphasis supplied).

Thus according to its plain terms the will says that all proceeds from mineral royalties shall be included as net income available for any distribution. The designation of all royalty proceeds as income is contrary to both generally accepted accounting principles and accepted engineering principles regarding the integrity of the corpus of a wasting asset. Generally, trust provisions that provide for distribution of income to life beneficiaries and for corpus to pass to charity present no difficulty for deduction valuations. The income is ascertainable and definite. Reference to actuarial tables is prescribed by Internal Revenue regulations and provide a basis for accurate determinations of value. A crucial distinction is presented here because of the nature of wasting assets; here oil royalties. An aliquot portion of each dollar received as royalty should properly be considered as income and another portion should be allocated as principle. The allocation process recognizes the fact that the mere act of producing and selling the asset is also an act reducing the total quantity or amount of asset available to be produced. Because there is no allocation of royalty proceeds to corpus in the will, the government maintains that either (1) the remainder over to charity is rendered unascertainable or (2) the possibility of charity taking is so remote as to be negligible.

Plaintiff contends that this question need not be reached because the will by its terms provides a measurable standard for the exercise of its discretion, i. e., the bank did not have unfettered discretion to distribute income but must be guided by the amounts of income which would be appropriate for the needs of the life beneficiary. It urges that the above quoted paragraph VII (B) be read to mean that the bank is directed to distribute in its complete and absolute discretion to and for the benefit and use of the life beneficiary *only* that portion of income and/or corpus as it determines is appropriate for his needs. The Court is unpersuaded that this view presents a fair and common-sense reading of the plain words of the instrument. The language of the will is clear and unambiguous. Its very words say a distribution is to be made of *all* of the income and *so much of* the corpus. To correlate a distribution of all of the income with a standard of that which is appropriate to his needs overlooks the language pertinent to corpus. How much corpus is to be distributed? Only so much of the corpus as is appropriate for the life beneficiary's needs. How much income? All of the income. The Court specifically finds the will unambiguous; that it gives the corporate trustee complete and absolute discretion to distribute all of the income without regard to any standard save its own discretion; that it gives the corporate trustee sole discretion to distribute so much of the corpus which it determines in its discretion is appropriate for his needs. The Court is obligated to interpret the will as a whole and give an interpretation which effectuates the intent of the testatrix as is reflected in the words which she used. *Huffman* v. *Huffman,* 161 Tex. 267, 339 S.W.2d 885, 888 (1960). Only where there exists ambiguity can extrinsic evidence be considered. In this matter both parties assert that the will is unambiguous. The

Court agrees. The divergence is over what that unambiguous instrument states. The Court concludes that mere disagreement over what the language of an instrument means by parties to litigation is insufficient to make clear language obscure. *Huffman* v. *Huffman,* 329 S.W.2d 139 (Tex.Civ.App.—Fort Worth 1959), aff'd, 161 Tex. 267, 339 S.W.2d 885 (1960).

■ The bank next asserts that even if the language of the will cannot support some obstruction to the exercise of its discretion to distribute all of the income, then Texas law will provide one. It may well be that in some jurisdictions, state law will provide standards for a trustee to measure his discretion. In Texas, however, it is fundamental that the Texas Trust Act was intended to and does in fact "supplement rather than to supplant the desires of a trustor". *St. Marks Episcopal Church, Mt. Pleasant, Texas* v. *Lowry,* 271 S.W.2d 681, 684 (Tex.Civ.App.—Fort Worth 1954, writ ref'd n. r. e.) It is only those actions which egregiously run counter to generally accepted accounting and fiduciary principles which are clearly proscribed by Texas law. *Thorman* v. *Carr,* 408 S.W.2d 259 (Tex.Civ.App.—San Antonio 1966), writ ref'd n. r. e., 412 S.W.2d 45 (Tex.Sup.1967). The Court has found that the will in question grants sole and complete discretion to the corporate trustee to distribute all of the income to the life beneficiary. The applicable Texas law would not interfere with a conscientious exercise of that discretion, even if this meant distributing income to the wealthy life beneficiary. *See, Atwell* v. *United States,* 339 F.Supp. 425 (S.D.Tex.1972). Of course, it is the mere presence of a power or ability to invade corpus which prohibits allowance of a deduction for a charitable remainder and not the exercise of that power. To the extent there is a power to invade the corpus for the benefit of a life beneficiary, the deduction must be disallowed. Conversely, to the extent there is no power to invade the corpus, then there may well be a deduction if the invasionary power is ascertainable and does not render the possibility of charity taking so remote so as to be negligible. *First National Bank in Palm Beach* v. *United States,* 443 F.2d 480 (5th Cir. 1971); *Zentmayer's Estate* v. *Commissioner,* 336 F.2d 448 (3rd Cir. 1964).

■ The Court further finds that in the case *sub judice,* the trustees did have an unfettered discretion to distribute all of the income to the life beneficiary. By the will's express terms, a portion of that income included amounts which properly are considered corpus. Accordingly, the Court concludes that to the extent that the corpus was permitted to be invaded the charitable deduction must fail. 26 U.S.C. § 2055; 26 C.F.R. § 20.2055–2.

The Court must now address the more difficult question of whether this partial invasion of corpus vitiates the entire deduction either by rendering the charitable remainder unascertainable or by making the possibility of its failing not so remote so as to be negligible. The Treasury's position on deductions for a charitable remainder consisting of wasting assets is considered in Rev.Rul. 60–162, 1960–1 Cum.Bull. 376. The Court believes that this ruling enunciates the controlling principles for this case. *Sanford's Estate* v. *Commissioner,* 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939); *Helvering* v. *Wilshire Oil Co.,* 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101 (1939). Revenue Ruling 60–162 in its entirety provides:

"Advice has been requested whether a devise in trust or a remainder interest in both surface and subsurface rights in land would qualify for a charitable deduction for Federal estate tax purposes if the will failed to provide for withholding and adding to corpus such reserves for depletion of subsurface resources as would be considered adequate, according to accepted accounting and engineering principles to maintain the corpus of the trust intact.

A decedent devised real property having surface rights worth dollars and depletable subsurface rights, including deposits of oil, gas, or minerals, or royalties, oil payments, leases, etc., based on such deposits, worth dollars, in trust, to pay the net yield from the property to a private beneficiary for life, remainder to charity. The will contained no provision for deducting from the net income payable to the private beneficiary an amount attributable to depletion.

Section 2055 of the Internal Revenue Code of 1954 provides for deduction of the amount of all bequests, legacies, devises, or transfers for public, charitable and religious uses. This deduction extends to transfers of future as well as present interests.

Section 20.2055–2(a) of the Estate Tax Regulations provides, in part, that if a trust is created for both a charitable and a private purpose, a deduction may be taken of the value of the beneficial interest in favor of the former only insofar as such interest is presently ascertainable and, hence, severable from the interest in favor of the private use.

Paragraph (b) of the same section provides that, in the case of a transfer in trust conveying to charity a present interest in income, no deduction is allowable if, by reason of all the conditions and circumstances surrounding the transfer, it appears that the charity may not receive the beneficial enjoyment of the interest. This rule is equally applicable to transfers of future interests to charity.

If a trustee is empowered to divert the property or fund, in whole or in part, to a noncharitable purpose, the deduction will be limited to the portion, if any, of the property or fund which is exempt from an exercise of the power. In the instant case, the failure to withhold and accumulate for the benefit of the charity such reserves for depletion of subsurface resources as are adequate, according to accepted accounting and engineering principles, to maintain the corpus constitutes a *pro tanto* diversion of corpus each year to the life beneficiary and a consequent deprivation of the charity's beneficial enjoyment.

The remainder factors of Table I, as set out in section 20.2031–7 of the Estate Tax Regulations, represent the present worth of a remainder in $1.00 of corpus payable at the death of an income beneficiary of a stated age. Such factors are computed on the assumption that the original corpus, or its reinvested equivalent, will be held intact for the benefit of remaindermen. Therefore, the remainder factors from Table I are applicable only for the purpose of computing the value of the charity's remainder interest in the surface rights in the property.

The questions of whether any deduction should be allowed for charity's remainder interest in the subsurface rights and, if so, how the amount of the deduction should be computed, will depend on the facts concerning the subsurface reserves, depletion rates, etc. There may well be cases where, although a present interest in subsurface rights can be accurately appraised, it is impossible to put a reliable appraisal on a remainder interest in those subsurface rights. Certainly, a valuation of the remainder interest would, at all events, have to be based on the maximum feasible rate at which the subsurface reserves could be withdrawn, since it is only the portion of the property which the charity is certain, to receive that qualifies for the charitable deduction. See, generally, *Merchants National Bank of Boston, Executor* v. *Commissioner,* 320 U.S. 256, [64 S.Ct. 108, 88 L.Ed. 35] Ct.D. 1591, C.B. 1943, 1123.

If the taxpayer is able to establish facts concerning the property which justify a conclusion that there is an interest in the subsurface rights which qualifies for the charitable de-

duction, then the present value of that interest would be deductible."

■ The Court initially notes that this ruling by the Treasury affirms the principle that there can be a charitable deduction for an interest in subsurface resources even where there is no withholding of a reserve for the depletion of such subsurface interest. Whether or not a deduction is to be allowed is a fact question which involves the subsurface reserves and the maximum feasible rate at which such reserves could be withdrawn. The ruling speaks in terms of a "valuation" of subsurface remainder interests. The standards which the ruling contemplates to be used in ascertaining any failure to withhold and add to corpus such reserves for depletion of subsurface resources are those " . . . considered adequate, according to accepted accounting and engineering principles. . . ." *Merchants National Bank* v. *Commissioner*, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943) is cited as the seminal authority for the ruling. *Merchants National Bank* enunciates the standards for determining if remainders over to charity qualify as a deduction by being capable of having a value "presently ascertainable, and hence severable from the interest in favor of the private use . . . ." 320 U.S. at 260, 64 S.Ct. at 111.

" . . . [T]he standards by which the extent of permissible diversion of corpus is to be measured [can] embrace factors which cannot be accounted for accurately by reliable statistical data and techniques. Since, therefore, neither the amount which the private beneficiary will use nor the present value of the gift can be computed, deduction is not permitted.

For a deduction under [the predecessor statute] to be allowed, Congress and the Treasury require that a highly reliable appraisal of the amount the charity will receive be available, and made, at the death of the testator. Rough guesses, approximations, or even the relatively accurate valuations on which the market place might be willing to act are not sufficient.

Only where the conditions on which the extent of invasion of the corpus depends are fixed by reference to some readily ascertainable and reliably predictable facts do the amount which will be diverted from the charity and the present value of the bequest become adequately measurable. And, in these cases, the taxpayer has the burden of establishing that the amounts which will either be spent by the private beneficiary or reach the charity are thus accurately calculable." 320 U.S. at 260–61, 64 S.Ct. at 111 (citations omitted).

The Supreme Court applied the above-mentioned standards to deny a deduction where a decedent's will permitted invasion of corpus for "the comfort, support, maintenance, and/or happiness of my wife." 320 U.S. at 261, 64 S.Ct. at 111. Rough guesses are precluded for valuations of charitable remainder interest as a deduction. Likewise use of approximations is proscribed. Even relatively accurate valuations on which the market place might be willing to act are not sufficient. Only adequately measurable interests; those which can be accurately calculable can be considered deductible. The burden is on the taxpayer to establish such facts and he must do so by reference to reliably predictable ones. 320 U.S. at 261, 64 S.Ct. 108.

■ The Court concludes that the significant reliably predictable facts which the Treasury deems accurately calculable and adequately measurable must, in the case of wasting assets, be the quantity of subsurface reserves and the maximum feasible rate of withdrawal. The Court further concludes that these facts can be accurately calculated and adequately measured by accepted accounting and engineering principles. Rev.Rul. 60–162, 1960–1 Cum.Bull. 376. In other words, the Treasury in applying its expertise to the matter has decided that accepted accounting and engineering principles are not rough guess-

es, approximations or even market place judgments. If the failure to withhold and accumulate adequate subsurface resources by way of accepted accounting and engineering principles is a *pro tanto* diversion of corpus, then use of those same accepted principles must be a proper way to determine what portion of corpus has been diverted and what portion remains. How else could a taxpayer ever establish such facts concerning property to justify a conclusion that there is an interest in subsurface resources which qualifies for a charitable deduction? Rev.Rul. 60–162, 1960–1 Cum.Bull. 376.

In the case at bar the issue reduces to whether plaintiff has met its burden of proof in showing a certainty of charity taking under the will that is not so remote so as to be negligible and that such interest, if any, is capable of an ascertainable value.

The crucial difficulty presented itself by the historical development of the estate's adventures with the tax gatherer. As heretofore mentioned an estate tax return was timely filed by the independent executor (who was also the life beneficiary of the trust in question).[1] This return greatly understated the value of the bulk of the estate's mineral interest. The mineral interests were returned at $649,200.00. Plaintiff, as successor independent executor, had adjustment discussions with the Treasury Department representatives and agreed the estate was undervalued. The estate was subsequently revalued to $1,578,910 and the charitable remainder was disallowed as a deduction.[2] The Treasury's engineer's report of revaluation indicated that Internal Revenue based their valuation of reserves of oil in part on estimates provided by plaintiff's consulting engineer. The report concludes:

"There have been very few sales of minerals under the ranch in recent years and none of a magnitude sufficient to indicate fair market value for a tract as large as 1,578.91 acres. We have therefore estimated the fair market value based on estimated reserves of oil and projected rate of production. It is believed that the fair market value of the reported minerals is $1,000.00 per mineral acre or $1,578,910.00 and that the reserves of oil to this interest are 1,503,723 barrels. This indicates that each barrel of oil in the ground is worth $1.05."

This was and is the Treasury's valuation of the reserves of oil to be included in the gross estate. Plaintiff now asserts this value as the value of the mineral interest in question as both the gross estate value and the charitable remainder deduction value. In other words, the estate says: we have a value acceptable to you (Treasury) as a value of our gross estate; now we have a gift over to charity after the expiration of an intervening life interest; we can value the amount of royalty which could at a maximum be produced during the actuarial life of the life beneficiary; therefore, we have an ascertainable value to the charitable remainder. The government says this is false reasoning. It asserts that it is not bound by its previously agreed to value of the minerals for gross estate tax purposes for the purposes of computing a charitable remainder. The standards are said to be distinct.

The Court agrees that there are different measures for determining the value of a gross estate and for determining the value of a charitable remainder to qualify as a deduction. Similar problems, however, are encountered for each valuation and the valuations could in fact be the same. While the government is not conclusively bound by its valuation of the mineral interest for inclusion in the gross estate, the Court finds that the Treasury's acceptance of this value for one purpose lends support in this instance to other credible evidence indicating that the values were in fact one and the same. The value accepted for gross

1. Plaintiff's Exhibit 3–A.

2. Plaintiff's Exhibit 3–B.

estate purposes was not a mere guess or approximation, but rather was based on competent engineering principles.

■ Valuations of property are inherently areas of difficulty.[3] Valuations of royalty interest are particularly difficult. Remainder interest in royalty even more so. It is recognized that where valuations of remainder interests of royalty are for gross estate tax purposes, there is no strict formula which can be applied. Instead, there is a basic framework of inquiry which includes questions such as: (1) how much money is to be received from royalty each year; (2) how much longer will the royalty last; (3) what are the risks involved and (4) what is the relationship of royalty received in prior years to future royalty during the intervening estate. 1 CCH 1971 Fed. Estate and Gift Tax. Rep. ¶ 1215.75. In the area of valuation of royalty interest for gift tax purposes, fair market value based on the testimony of experts as to existing oil reserves has been used. *Craig* v. *Commissioner*, 8 TCM 1019, 1023 (1949).

The Court reemphasizes it is aware that different standards are applicable for different valuation purposes. Valuation of a remainder interest of royalty for gross estate tax purposes is distinct from valuation for gift tax purposes. Likewise, they are both distinct from valuation of a royalty remainder interest qualifying as a charitable deduction. The standards are separate. At the same time, however, there are common key questions to be decided for each area. There is nothing to prohibit the values for a gross estate and a charitable remainder interest from being in fact the same. For the purposes of establishing that it is entitled to a charitable deduction, plaintiff must demonstrate the subsurface reserves and the maximum feasible rate at which they could be withdrawn. Rev.Rul. 60–162, 1960–1 Cum.Bull. 376. This demonstration must be as of the date of the decedent's death and must be in accord with accepted accounting and engineering principles. In discharging this burden, it is apparent that the accepted accounting and engineering principles will overlap, conceptually as well as practically, the valuation methods used for gross estate valuations or gift tax valuations.

■ Examining the evidence before it, the Court is pursuaded that plaintiff has discharged its required burden. The Court finds that the reserves of oil in the ground were reliably and accurately calculable on the date of Mary Lard's death. Numerous calculations were presented to the Court. The Court finds that the testimony of plaintiff's valuation expert, Mr. William B. Watson best reflects the amount of reserves of oil in the ground for the Gulf-Goldsmith lease on the date of Mary Lard's death. That testimony in part states:

"Q. All right, sir. At the time you were called upon to make this appraisal, which bear in mind would be as of March 5, 1968, were records relating to the Gulf-Goldsmith lease available to you?

A. Yes, sir.

Q. And what did they consist of, generally?

A. Well, production records, the history of the field, the well histories, the bottom hole pressure, surface gas oil ratio, a petroleum engineering report from time to time that I had knowledge of and the right to see.

Q. Could you say basically those were the Gulf records?

A. Basically, yes, sir.

Q. And what particular time would they involve?

A. Well, from the beginning of production, 1935.

Q. Up to '68, at least?

A. Yes.

Q. All right now, I will ask you, based on the data available to you, did

---

3. The term "valuation" itself embraces the concept of estimates. Webster's Third New International Dictionary, (G. & C. Merriam Co., 1971).

you form an opinion as to the remaining reserve of oil in the entire Gulf-Goldsmith lease as of March 5, 1968, that could be reasonably projected to be produced commercially?

A. Yes, sir.

Q. Would you state your opinion in barrels?

A. 150,600,000 barrels.

Q. 600,000?

A. 600,000, yes.

Q. Then I ask you, based on data available to you, did you form an opinion as to the number of barrels that could reasonably be predicted to be produced annually from and after March 5, 1968, and the period applicable thereto?

A. Yes, sir, I made an estimate of that.

Q. Would you state your opinion as to that estimate?

A. To the Lard interest?

Q. To the Lard interest. We are talking about the community interest of the Lards now.

A. To that interest, the estimate that I made was 1,503,000.

Q. All right, sir, I am not sure you understand my question. I will come to that in a minute. I am saying, based on the data available to you, did you form an opinion as to the number of barrels of oil that could reasonably be projected to be produced annually —annually now from and after March 1, 1968, and the period over which that annual production could be predicted?

A. I made an estimate of that, yes.

Q. Would you state that estimate?

A. That was on the basis of the trend that the production would maintain itself at the rate of about 11.4 hundred thousand barrels.

Q. 11.4 hundred thousand barrels a year?

A. A year, or roughly 32,000 barrels per day over a period of time until it started declining, until on or about 1975."

Each calculation that the government offered to dispute this testimony presupposed the question of what reserves were in existence. At one point the government expert admitted that his calculations were "close" to those of plaintiffs.[4] I find that the government's attack on plaintiff's expert was in large part merely an elaboration of the point that it (the value) was only the agreed to value for gross estate purposes. This overlooks the predicate for plaintiff's expert's testimony, i. e., that he considered production records, field history; individual well histories; bottom hole pressures, surface gas oil ratio and the like. In other words, plaintiff's expert employed accepted engineering principles to reach his conclusion as to the amount of reserves. This is the first of the two pronged aspects of Revenue Ruling 60–162; subsurface reserves.

The second aspect of that ruling concerns the maximum rate of depletion. Again Mr. Watson's testimony went to the point and was to the effect that his calculations as to reserves at the end of the actuarial life of the life beneficiary considered a maximum production that could be expected. The government's expert witness obliquely corroborated the fact that the field was in a maximum recovery stage by testifying that water flood production was being employed to assure a maximum recovery.[5]

■ The value of the reserves of oil in place was admittedly an estimate of fair market value. But this estimate was based on the reserves of oil and the projected rate of production.[6] As indicated above, the estimates of reserves and

4. *Transcript of Proceedings*, p. 351 (hereinafter *Transcript*) ; *See also* defendant's Exhibit 19.

5. *Transcript*, p. 349.

6. Plaintiff's Exhibit 3–B.

rate of production were based on competent engineering principles and techniques. The Treasury regulations do not preclude the use of estimates in ascertaining value. The enterprise of computing reserves and production rates is necessarily an estimate. In another context, the Tax Court has recognized this aspect as to the amount of reserves.

" . . . Any conclusion as to the amount of recoverable oil on the basic dates must necessarily be an estimate. [The] record demonstrates how able and experienced men in the industry can take known facts and reach divergent results." *Craig, supra*, at 1023.

In the instant controversy, the value of a single mineral acre was estimated and from that value a value was assigned to the total royalty interest. Division of this figure would yield a value for each barrel. There is testimony that this figure was used for cost depletion purposes. Such a use is consistent with income tax principles, accounting principles as well as for engineering purposes. Furthermore, there is testimony reflecting that the amount of cost depletion is the amount used by national banks in their allocations to the corpus of their trust accounts which consist of wasting assets. Plaintiff's trust officer testified that where there is a cost depletion value, then this value is the proper one to assign to corpus according to accepted accounting procedures.

 The government is not bound to accept for a charitable remainder their agreed on value as to mineral interest for gross estate tax purposes. But the fact that it agreed to a value for this purpose does not preclude a showing that the value may be used for other purposes. It can be that such an agreed on value is based on accepted accounting and engineering principles. The two values can be one and the same. The Court finds that this is what has been shown in this case. Value itself is a relative concept and the best measure we have is generally accepted accounting principles. This is conceded by the Treasury in Revenue Ruling 60–162. The Supreme Court has stated that factors which can be accounted for accurately by reliable statistical data and techniques are appropriate to apply to charitable remainder deduction calculations. *Merchants National Bank* v. *Commissioner*, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943). If there is ever to be a charitable remainder deduction which involves a wasting asset, then there must be reliance on accounting data and techniques. To hold otherwise would mean there could never be such a deduction. Although strict standards are to be applied, Congress and the Treasury regulations did not preclude until 1969, such a deduction.[7] Reconciling the government's theory to the facts of this case is an unusual application of the appropriate standards. The Treasury, however, is familiar with unusual approaches to accounting theory. In *Mackinac Island Carriage Tours, Inc.* v. *Commissioner*, 419 F.2d 1103 (6th Cir. 1970) it took the position that tangible assets are presumed not to exist after the expiration of the income tax depreciation period. The Court in that instance characterized such approach as "bizarre" and "unsupportable". *Accord, National Bank of Commerce in Memphis* v. *United States*, 422 F.2d 1074, 1076, n. 2 (6th Cir. 1971). This Court believes that a disregard of accepted accounting and engineering principles, which necessarily involve "estimates" is likewise bizarre. In disallowing the deduction the Treasury disregarded sound accounting and engineering principles. This disregard is in addition to its misapplication of its own ruling and strained construction of the Supreme Court's teaching that reliable statistical data and techniques are proper. *Merchants National Bank* v. *Commissioner*, 320 U.S. 256, 261, 64 S.

---

7. The present law requires that the amount to charity be guaranteed and not be predicated on actuarial calculations. Tax Reform Act of 1969; 83 Stat. 487; Int.Rev.Code of 1954 § 2055(e), as **amended.**

Ct. 108, 88 L.Ed. 35 (1943). I conclude that a charitable remainder deduction should be allowed to the extent that a remainder was shown after deducting the maximum production over S. S. Lard's actuarial life from March 5, 1968, from the reserves as finally reflected on Mary Lard's Estate Tax Return.

This opinion constitutes findings of fact and conclusions of law in this cause. Counsel have indicated that the exact amount of the deduction to be allowed will involve consideration of the legal expenses in this litigation. Counsel will submit an order for judgment reflecting same and consistent with this opinion within thirty days from the date of entry.

## ORDER

 The Court's Memorandum Opinion of February 5, 1975, in the above-captioned and numbered cause, requested counsel to prepare a judgment consistent with the Court's decision. Counsel advised the Court of disagreement over the proper drafting of such a judgment and requested an opportunity to advise the Court of the difficulties. Accordingly, the Court met with respective counsel in chambers on April 23, 1975, and received further authority for each position. After hearing this argument in chambers, and having reviewed the testimony of the trial in the light of such argument, the Court remains convinced that the valuation of the taxpayers royalty interest, and the valuation of the remainder interest which is to pass to charity was calculated using sound engineering and accounting principles as well as being agreed to by the parties. The Court is convinced and so finds that this value was intended to and did in fact encompass a discount to reflect the risks attendant to owning an interest in wasting assets as well as the present value of the interest.[1,2]

Accordingly, a judgment will be entered for plaintiff.

It is so ordered.

1. The government is familiar with the concept of valuations containing inherent discount factors. In *Estate of Frankel v. United States*, 512 F.2d 1007 (5th Cir. 1975), the government contended that the risk of non-payment is inherent in the interest rate where production payments out of royalty are concerned. The Fifth Circuit rejected such an approach there, but realized that where such a risk allowance is included no further discount is warranted. *Id.*, 512 F.2d at 1011 and n. 7. I have found that the $1.05 valuation in the instant case does contain such a risk allowance.

2. *Cf. Stanton v. Commissioner*, 26 TCM 191 (1967). The Tax Court reviewed the factors which are to be considered in appraising oil properties. The last step in such a valuation is that ". . . the total expected future net income is discounted to arrive at the present value of the future net income to a prospective purchaser, taking into account the risks involved in oil and gas properties . . ." *Id*, at 199. In the instant case, there was controverted testimony over what either party considered the $1.05 to cover, but I am convinced that at the very least it does represent a fair and accurate value of the charitable remainder deduction.