ESTATE OF FRED A. BROCK, JR., ELEANOR BROCK ILFREY, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1570–77.     Filed February 27, 1979.

*Leland B. Kee,* for the petitioner.
*William D. Peltz,* for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a deficiency in petitioner's Federal estate tax of $36,490.28. The only issue

---

[3]But consider sec. 2613(d)(2) possibilities.

presented is whether the decedent's estate is entitled to a charitable deduction under section 2055[1] for a gift to a church of a nontrust remainder interest in a salt royalty where an intervening life interest in the salt royalty was devised free of trust to his surviving spouse. The case was submitted on a stipulation of facts.

Petitioner is the Estate of Fred A. Brock, Jr., Eleanor Brock Ilfrey, executrix, who resided in Houston, Tex., when the petition herein was filed.

The decedent, Fred A. Brock, Jr., was born on May 1, 1902, and died testate on March 18, 1973. His will was executed on February 14, 1972. At the time of his death, his wife, Eleanor Chevalley Brock, was 72 years old. He had married her less than a year and a half earlier, on November 5, 1971. His only other survivors were his daughter, Eleanor Brock Ilfrey (the executrix of his will), and her two daughters, the decedent's grandchildren. The total gross estate reported on the estate tax return was $1,320,824, the great bulk of which was bequeathed by means of a residuary clause in his will to the decedent's daughter and his grandchildren (or for their benefit). The only testamentary disposition in favor of the widow was a life interest in a portion of a salt royalty owned by the decedent, more fully hereinafter described. The controversy herein revolves around the claimed deductibility of a gift of the remainder of that portion of the salt royalty to a church.

The decedent originally owned a fractional interest in the salt royalty. Some time prior to his death he had given one-half of his fractional interest to his daughter and grandchildren.[2] He disposed of the remaining one-half of his fractional interest in the salt royalty by his will executed some 3 months after his last marriage. He thereby gave one-half of that remaining one-half to his daughter and grandchildren in a specified manner, and the other one-half of the remaining one-half of his fractional interest to his surviving wife for life with remainder to a church. The total value of the spouse's life estate plus the remainder to

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.

[2] The record does not disclose when such inter vivos gift was made, but the estate tax return shows that no inter vivos transfers had been made to anyone during the 3 years immediately preceding death in an amount of $1,000 or more, thereby indicating not only that this gift to his daughter and grandchildren was made more than 3 years prior to his death but also that he had not made any inter vivos gifts of consequence to his surviving spouse during that period.

the church was $118,125 as of the applicable valuation date. Article Fifth of the will provided as follows in respect of the life estate and charitable remainder:

FIFTH: At the present time I am the owner of mineral interests in the various surveys known as Stratton Ridge located in Brazoria County, Texas, from which there are producing salt brine wells, presently operated by the Dow Chemical Company, from which I receive royalty and which I will hereinafter designate as "salt royalty".

\* \* \* \* \* \* \*

I hereby give, devise and bequeath unto my wife, Eleanor Chevalley Brock, one-half (½) of the remaining salt royalty (being one-fourth (¼) of the original total salt royalty that I own) for as long as my wife, Eleanor Chevalley Brock, shall live. At the time of the death of my wife, Eleanor Chevalley Brock, I give such salt royalty in fee simple absolute to the Trustees of The First Presbyterian Church of Angleton for the use and benefit of The First Presbyterian Church of Angleton as said Trustees shall in their sole discretion so decide.

The First Presbyterian Church of Angleton (hereinafter church) is a qualified beneficiary within the intendment of section 2055(a). Decedent's surviving spouse is not such a qualified beneficiary.

The gifts to decedent's spouse and the church consisted of a life interest and a remainder interest, respectively. The remainder interest was not in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5)). No judicial proceeding was begun on or before December 31, 1977, to amend or conform the governing instrument (the will) so that the interest left to the church would be in a trust which is a charitable remainder annuity trust, a unitrust, or a pooled income fund.

Decedent's interest in the salt royalty referred to in article Fifth of the will was established by a "Salt and Storage Agreement" (hereinafter agreement) dated September 1, 1960. In this agreement, decedent and several others, apparently all members of the decedent's family, as "lessors," granted and leased to the Dow Chemical Co., "lessee," exclusive rights to produce and take salt[3] from 1,510 acres of land in Brazoria County, Tex., owned by lessors. In exchange, Dow Chemical Co.

---

[3]The agreement also refers to hydrocarbons and other natural resources, but the possible significance of hydrocarbons and natural resources other than salt does not appear in the record.

agreed, in part, to pay a monetary royalty which was based on the amount of salt produced from the land and which was computed in accordance with an index of chemical prices, subject to a guaranteed annual minimum royalty not based on production.[4] The initial term of the agreement was 1 year, but the agreement could be extended for a potentially unlimited term as long as specified mineral operations were conducted on the land and the guaranteed annual minimum royalty were paid.[5] Dow Chemical Co. was at any time entitled to terminate the agreement and to relieve itself of all obligations, including the minimum royalty, by releasing the entirety of the leased premises to the lessors.

Under the agreement, the lessors (including decedent) reserved rights to use for residential and grazing purposes parts of the land involved. As to the residential use, the agreement provided:

LESSEE shall not conduct any of its operation within two hundred fifty (250) feet of the residence located on the leased premises so long as said residence is occupied by Mrs. Carrie S. Brock [one of the lessors][6] or any of the other LESSORS named herein.

The grazing use was reserved in the following terms:

The LESSEE [Dow Chemical Co.] shall have the right to the exclusive use and possession of so much of the surface of the land described herein as shall be reasonably necessary in the exercise of the rights and privileges granted it hereunder, but the LESSORS shall have the right to use the same for grazing purposes.[7]

The only property left to his surviving spouse by the decedent was the life interest in the salt royalty devised by article Fifth of his will; no property of the decedent passed to the surviving spouse outside of his will. As noted above, the total value of the interest left to decedent's surviving spouse plus the interest left

---

[4]Dow Chemical Co. also agreed to pay an initial sum of $211,500 over a period of 9 years as consideration for the lease.

[5]The salt was apparently to be recovered from subsurface pools of brine, and Dow Chemical Co. was given the sole right to determine how many wells to drill and to control the extent of development and of operations on the land, provided only that it complied with the other terms of the agreement, including the guaranteed annual minimum royalty obligation.

[6]On brief, petitioner advises that Carrie S. Brock was decedent's mother.

[7]In connection with the reserved grazing rights, the agreement granted to lessors the right to connect with Dow Chemical Co.'s water supply for use in "watering livestock of the LESSORS pastured or to be pastured on said LESSORS' ranch * * * part of which land is included and covered by this lease."

to the church by the provisions of article Fifth of the will was $118,125 as of the applicable valuation date.

Decedent's estate claimed no marital deduction on its estate tax return in respect of any transfer of an interest in the salt royalty to the surviving spouse. However, it did claim a $93,566 charitable deduction in respect of the gift of the remainder interest in the salt royalty to the church. The Commissioner determined that the charitable deduction was not allowable by reason of section 2055(e)(2).

The parties have stipulated that if it is determined that the entire remainder interest left to the church is, in fact, deductible from the gross estate, then the amount of that deduction is $66,046.05.

The issue in this case is whether the remainder interest in the salt royalty given the church under decedent's will is rendered nondeductible by section 2055(e)(2).[8] This section, added by the Tax Reform Act of 1969, generally disallows estate tax deductions for transfers of remainder interests in property for public, charitable, or religious uses, unless the remainder is in a trust which is a charitable remainder annuity trust or unitrust (described in section 664), or a pooled income fund (described in section 642(c)(5)). However, if the charitable gift is a "remainder

---

[8]Sec. 2055(e)(2) provides:

(e) DISALLOWANCE OF DEDUCTIONS IN CERTAIN CASES.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) Where an interest in property (other than a remainder interest in a personal residence or farm or an undivided portion of the decedent's entire interest in property) passes or has passed from the decedent to a person, or for a use, described in subsection (a), and an interest (other than an interest which is extinguished upon the decedent's death) in the same property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to a person, or for a use, not described in subsection (a), no deduction shall be allowed under this section for the interest which passes or has passed to the person, or for the use, described in subsection (a) unless—

(A) in the case of a remainder interest, such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5)), \* \* \*

Sec. 2055(e)(2) applies to decedents dying after Dec. 31, 1969. Pub. L. 91–172, secs. 201(d)(1) and 201(g)(4)(A), 83 Stat. 560, 565. It was amended, effective for contributions made after June 13, 1976, by Pub. L. 94–455, sec. 2124(e), 90 Stat. 1919–1920, and Pub. L. 95–30, sec. 309(b)(2), 91 Stat. 154.

Sec. 2055(e)(3), amended in pertinent part by Pub. L. 94–455, sec. 1304(a), 90 Stat. 1715, and Pub. L. 95–600, sec. 514(a), 92 Stat. 2883–2884, allows some deductions otherwise barred by sec. 2055(e)(2). In the case of charitable gifts of remainder interests made by wills executed before Dec. 31, 1977, a charitable deduction will be allowed for a gift not satisfying sec. 2055(e)(2) if judicial proceedings are successfully instituted on or before Dec. 31, 1978, to amend the will changing the form of the gift to a charitable remainder annuity trust or unitrust, or a pooled income fund. No judicial proceedings to so amend decedent's will were in fact instituted by Dec. 31, 1977, and the record is silent concerning any such proceeding that may have been instituted before Dec. 31, 1978.

interest in a personal residence or farm or an undivided portion of the decedent's entire interest in property," the requirement that specified types of trusts be utilized does not apply. Thus, since the gift here at issue was not in trust, and, a fortiori, not in one of the specified types of trusts, the deduction was properly disallowed unless the church received "a remainder interest in a personal residence or farm or an undivided portion of decedent's entire interest in property." Sec. 2055(e)(2). Petitioner bears the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure. We hold that the salt royalty interest given the church was not within the class of deductible nontrust remainder interests described in section 2055(e)(2).

The estate contends that the remainder in the salt royalty was a remainder interest in a personal residence or farm as these terms are used in the statute.[9] However, we think that the record does not establish the underlying factual basis for this result. For purposes of section 2055(e)(2), section 20.2055(e)(2)(ii) and (iii), Estate Tax Regs.,[10] defines a personal residence as any property *"which was used by the decedent"* as his personal residence, and a "farm" as any land *"used by the decedent"* or his tenant for the production of crops and the like, or for the sustenance of livestock. The only proof offered by the estate that decedent himself used the tract of land for the required purposes comes from the provisions in the agreement granting decedent and his other colessors the *right* to use a residence on

---

[9]Petitioner does not make any argument that the gift of the remainder to the church was deductible as "an undivided portion of the decedent's entire interest in property" within the meaning of sec. 2055(e)(2). In any event, any such argument would have been fatally defective. See sec. 20.2055–2(e)(2)(i), Estate Tax Regs.

[10]Sec. 20.2055–2(e)(2), Estate Tax Regs.:

(ii) *Remainder interest in personal residence.* The charitable interest is a remainder interest, not in trust, in a personal residence. Thus, for example, if the decedent devises to charity a remainder interest in a personal residence and bequeaths to his surviving spouse a life estate in such property, the value of the remainder interest is deductible under section 2055. *For purposes of this subdivision, the term "personal residence" means any property which was used by the decedent as his personal residence even though it was not used as his principal residence.* For example, a decedent's vacation home may be a personal residence for purposes of this subdivision. * * *

(iii) *Remainder interest in a farm.* The charitable interest is a remainder interest, not in trust, in a farm. Thus, for example, if the decedent devises to charity a remainder interest in a farm and bequeaths to his daughter a life estate in such property, the value of the remainder interest is deductible under section 2055. *For purposes of this subdivision, the term "farm" means any land used by the decedent or his tenant for the production of crops, fruits, or other agricultural products or for the sustenance of livestock.* The term "livestock" includes cattle, hogs, horses, mules, donkeys, sheep, goats, captive furbearing animals, chickens, turkeys, pigeons, and other poultry. A farm includes the improvements thereon.

[Emphasis added.]

the leased premises as long as it was occupied by Mrs. Carrie S. Brock or by any of the other lessors, and the *right* to use the land for grazing purposes. Such evidence is insufficient for us to find that decedent, rather than one or more of his other colessors, did, in fact, personally use the land for residential or farming purposes. Indeed, the sparse materials in the record indicate that the residence was in fact occupied by the decedent's mother without any affirmative suggestion that it was also used as a residence by him. Moreover, even assuming that the decedent may have used the property for residential or farm purposes at one time, the record is barren of evidence that such usage by him may not have terminated long before his death. Our doubts in this respect are enhanced by the fact that no ownership interest held by the decedent at the time of his death in cattle or other personal property relating to the operation of a farm or ranch was disclosed by decedent's estate tax return. We conclude that the estate did not carry its burden of proving that the remainder interest was part of decedent's personal residence or farm as defined by the regulations.

Even if petitioner had carried its burden of proof in this respect, we think that the estate would still not be entitled to prevail.

The estate argues that decedent's royalty interest was "real property" that was part of, or appurtenant to, decedent's personal residence or farm.[11] From this, petitioner would have us conclude for purposes of section 2055(e)(2) that the royalty interest was an interest in a personal residence or a farm, and that it remained so even after it was given to the church apart from the surface estate in the land allegedly used by decedent for residential or farming purposes.[12] We think that this construction of section 2055(e)(2) is strained and at odds with the purpose of the statute.

---

[11]See, e.g., *Sheffield v. Hogg*, 124 Tex. 290, 77 S.W.2d 1021, 1024 (1934); *Tennant v. Dunn*, 130 Tex. 285, 110 S.W.2d 53, 57 (1937).

[12]Petitioner does not contend that the church received an interest in the surface estate.

In Texas, a mineral royalty may be conveyed apart from the surface estate. See, e.g., *Lemar v. Garner*, 121 Tex. 502, 50 S.W.2d 769, 772–773 (1932); 42 Tex. Jur. 2d., Oil and Gas, sec. 58 at 132–134; 43 Tex. Jur. 2d., Oil and Gas, sec. 453 at 190–192. A will is a sufficient instrument to do this provided the testator so intended. *Zahn v. National Bank of Commerce*, 328 S.W.2d 783, 792 (Tex. Civ. App. 1959), writ refused n.r.e. Article Fifth of decedent's will refers only to "mineral interests * * * from which [decedent] receive[d] royalty." There is no evidence that decedent intended to pass to the church, rather than to the takers under the residuary clause [his daughter and grandchildren], any interest in the surface estate.

Section 2055(e)(2) was added in 1969 to correct abuses in the charitable deduction area regarding transfers of an income interest in property to a private person followed by a remainder to charity. The House of Representatives was concerned that charitable deductions in excess of the amount the charity might actually receive were being allowed under the then-used method of determining the present value of the charitable remainder. The valuation method assumed a 3½-percent rate of income return on the assets. See H. Rept. 91–413 (Part 1), 91st Cong., 1st Sess. 58 (1969). However, a trust could pursue policies tending to increase the value of the income interest at the expense of the remainder interest, such as investing in high income, high risk assets. This would defeat the rate of return assumptions used to value the remainder and could overstate the charitable deduction. See H. Rept. 91–413, *supra* at 58. The solution adopted by the House was to disallow all income, estate, and gift tax deductions for charitable remainders except for gifts of remainder interests in two types of trusts: A trust paying the income beneficiary a fixed dollar annuity at least annually (annuity trust), or in a trust paying the income beneficiary a fixed percentage of the fair market value of the trust's assets valued annually (unitrust). H. Rept. 91–413, *supra* at 59; see, e.g., H.R. 13270, sec. 201(h), as passed by the House on August 7, 1969 (estate tax charitable deduction). The House provision was designed to "remove the present incentive to favor the income beneficiary over the remainder beneficiary by means of manipulating the trust's investments." H. Rept. 91–413, *supra* at 59.

The Senate generally agreed with the House regarding the need for closer correlation between the amount actually received by a charity and the amount of the charitable deduction. However, it chose to expand the category of deductible remainder interests beyond that permitted in the House bill to include nontrust remainder interests in real property.[13] The Senate Finance Committee stated (S. Rept. 91–552, 91st Cong., 1st Sess. 87 (1969)):

The requirement that a deduction is to be allowed only if the remainder interest given to charity is in the form of an annuity trust or unitrust could have a significant adverse effect on established forms of charitable giving,

---

[13]The Senate also made an exception for gifts of remainders in trusts which are "pooled income funds" described in sec. 642(c)(5).

such as * * * outright gifts of real property, such as a residence, where the donor reserves a life estate in the property. Since these types of charitable giving cannot be framed in the form of an annuity trust or unitrust, the House provision would deny a deduction for the charitable gift. The committee believes that it is possible to continue to allow a charitable deduction in these types of cases with appropriate limitations, however, to prevent the overstating of the charitable contribution deduction.

The Senate committee observed that situations exemplified by an individual making a gift of his residence to charity while retaining the right to live in the residence for life do not present "the kind of abuse which both the House and the committee believe it appropriate to curtail." S. Rept. 91–552, *supra* at 89.

The Conference committee followed the Senate's amendments, but limited their scope by permitting deductions only for "remainder interests in real property consisting of personal residences or farms." Conf. Rept. 91–782, 91st Cong., 1st Sess. 294 (1969). The Conference version of the bill was enacted, adding section 2055(e)(2) to the Code.

It is apparent from the legislative history of section 2055(e)(2) that its primary purpose is to prevent possible abuses resulting from manipulation of the income stream from donated property in favor of a noncharitable tenant (for life or a term of years) to the detriment of the charitable remainderman. See *Ellis First National Bank v. United States*, 550 F.2d 9, 12, 16 (Ct. Cl. 1977). Congress recognized, however, that gifts of partial interests in personal residences or farms had special attributes making them less susceptible of manipulation. This perception did not extend to real property generally, but was strictly limited to farm and residential property. We think that when Congress made an exception for such gifts, it contemplated transfers that passed the residential or farming uses of the land, or at least the surface estate of land suitable for such uses, to the noncharitable tenant and the charitable remainderman.

The bequest in this case involved a salt royalty having no attributes of a personal residence or farm. As far as the salt royalty itself was concerned, it was a matter of utterly no consequence whether it related to salt deposits under a residence, a farm, an office building, a shopping center, a golf course, or a forest. Whatever the statutory purpose may have been that supported different treatment in the case of a personal residence or a farm, it had no relevance to rights in a salt royalty. Neither decedent's wife nor the church was given a

residence or a farm or rights to use the land for residential or farming purposes. No interest in decedent's land even susceptible of farming or residential use was the subject of a gift under article Fifth of the will. Under such circumstances, we think it improper to classify the church's gift as a remainder interest in a personal residence or farm.

Petitioner's interpretation of the statute would require us to ignore the fact that the church's salt royalty interest is subject to the same potential abuses that Congress sought to eliminate by the passage of section 2055(e)(2). A royalty interest produces a flow of profits that could be manipulated just as could the income from any other investment. For example, in a royalty arrangement such as that established by the agreement, a lessor could have influenced a cooperative lessee's rate of production so as to maximize income for the life tenant at a cost of depleting the value of the reaminder in much the same manner that a cooperative trustee, acting within the permissible range of discretion, might nevertheless exercise that discretion so as to favor the life tenant at the expense of the remainderman.[14] We do not mean to suggest that Dow Chemical was such a cooperative lessee or that it would have exercised its rights in the manner indicated. The point is that Congress drew a hard and fast line; it was the *possibility* of abuse against which the statute was aimed. See *Ellis First National Bank v. United States*, 550 F.2d 9, 16. See also *Commissioner v. Pepsi-Cola Niagara Bottling Corp.*, 399 F.2d 390, 392 (2d Cir. 1968) (Judge Friendly), reversing 48 T.C. 75 (1967) ("a legislature seeking to catch a particular abuse may find it necessary to cast a wider net" to include cases where the abuse may not actually be. present). It should also be noted that the risk of manipulation of the income from the salt royalty is not in any way affected by the residential or farming character of the surface of the land. The interests given to decedent's wife and the church were no different in kind from those they would have received had the surface of decedent's land been unsuitable for residential use or farming. If that were the case, the royalty would not be a deductible interest under section 2055(e)(2). The result should

---

[14]The lessee herein possessed rights to determine the rate of development and production, and to terminate the agreement at any time. It is at least theoretically possible that the church's interest could have been substantially diminished by the exercise of these rights or even completely defeated were the salt deposits exhausted and the agreement terminated before the death of decedent's spouse.

not be different because of the happenstance that the royalty in this case came from minerals below residential or farming property.

We are unconvinced by petitioner's argument that the value of the charitable remainder is not subject to manipulation because the Commissioner stipulated to its value. The issue is not, however, whether the remainder can be valued, but whether given the possibility of manipulating the flow of income, any valuation method can produce the requisite degree of certainty required by Congress. *Fort Worth National Bank v. United States*, 396 F. Supp. 337, 342–349 (N.D. Tex. 1975), affirmed 552 F.2d 158 (5th Cir. 1977), is distinguishable. That case involved a pre–1969 gift of a charitable remainder not subject to section 2055(e)(2), and the court there employed a method of valuation dependent upon an estimated rate of return or extraction. It was precisely the difficulty of determining an appropriate rate of return that led to the enactment of section 2055(e)(2) in 1969.

Petitioner next argues that Congress recognized that gifts of life estates in personal residences or farms are not susceptible of being put into one of the required forms of trusts. While it is true that a gift of rent-free use of a residence or a farm for life cannot be framed as an annuity trust, a unitrust, or a pooled income fund, the same cannot be said of a gift of a royalty based on natural resources beneath the surface of the property. The royalty might have been put in a testamentary trust specifying fixed payments of income or corpus to the life tenant as required by the statute. And although Congress made provision for the deduction of a charitable remainder gift that was otherwise precluded by section 2055(e)(2), provided that judicial proceedings were successfully initiated on or before December 31, 1978, to reform the will so as to change the form of the gift to an acceptable charitable remainder annuity trust or unitrust or a pooled income fund (see n. 8 *supra*), there is no evidence that any such course of action was undertaken here.

Petitioner's final argument is that the entire value of the salt royalty must go in whole or in part either to decedent's widow or

to the church, both tax-free recipients if the salt royalty were devised to either of them alone.[15] Thus, since the Government is deprived of no revenue regardless of how the benefits of the royalty are divided, petitioner contends, citing *Estate of Schildkraut v. Commissioner*, 368 F.2d 40 (2d Cir. 1966), reversing a Memorandum Opinion of this Court, certiorari denied 386 U.S. 959 (1967), that the normal rules of section 2055(e)(2), which would otherwise disallow the charitable deduction, do not apply. However, *Estate of Schildkraut v. Commissioner, supra,* a case involving a charitable remainder following a life estate in decedent's surviving spouse, does not itself stand for this proposition since it was decided before the enactment of section 2055(e)(2). Furthermore, although the Second Circuit in *Schildkraut* acknowledged that an argument similar to that made by petitioner here has some appeal, it stated that "the issue still must be whether the charitable deduction is permitted under the applicable law." (368 F.2d at 45.) The Court then proceeded to apply the tests existing under pre–1969 law and concluded that the charitable remainder was deductible. *Schildkraut* is not authority for creating a special exception to generally applicable rules of law to allow a charitable deduction specifically prohibited by the statute.

Moreover, even though the argument may have superficial appeal, reflection will show that it is really without substance. The marital deduction in general was intended to be applicable only if the property in question were given in its entirety either directly to the surviving spouse or in such manner that the surviving spouse had the power to control its disposition so as to make the surviving spouse the virtual owner of the property. See S. Rept. 1013 (Part 2), 80th Cong., 2d Sess. 16 (1948), 1948–1 C.B. 285, 342. But the decedent in this case did not appear to be willing to give his newly married wife any such outright interest in or control over the portion of the salt royalty involved.[16] Nor did he evidence any intention to give it in its entirety upon his death to the church. We must take the facts as we find them.

Finally, apart from the revenue considerations upon which

---

[15]Petitioner argues that the estate would have been entitled to a marital deduction under sec. 2056 had the entire undivided interest in the salt royalty been given to decedent's spouse instead of being divided between the spouse and the church. Petitioner does not claim a marital deduction under the facts of this case, however. See n. 16 *infra.*

[16]Indeed, petitioner apparently recognizes the force of this point and does not even claim that it is entitled to a marital deduction.

petitioner's argument is based, the independent public policy behind the charitable deduction—encouragement of charitable gifts, see, e.g., 4 J. Mertens, Law of Federal Gift and Estate Taxation, sec. 28.04 at 285–286 (1959 ed.)—is involved here. In enacting section 2055(e)(2), Congress may have believed that disallowance of charitable deductions for gifts structured so that they might never reach charity could increase the flow of property actually made available for charitable works. Whatever we may think of the wisdom of section 2055(e)(2), Congress made clear the extent to which marital deductions were to be allowed and the extent to which deductions of charitable remainders were to be allowed. Nothing in the legislative history of section 2055(e)(2) justifies a conclusion that Congress intended it to be inapplicable in this case, nor is the instant situation such a rare or unusual one as perhaps to suggest an inadvertent oversight. As a result of bifurcating ownership of the portion of the salt royalty here involved, the decedent carved up his gift in such manner as to render each segment nondeductible under the stringent statutory conditions plainly applicable in this case.

*Decision will be entered for the respondent.*