*Decisions will be entered under Rule 155.*

ESTATE OF ELIZA W. BLACKFORD, DECEASED, BANK OF CHARLES TOWN, ADMINISTRATOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3212–80.     Filed December 8, 1981.

*Dennis J. McLoughlin* and *Lewis M. Costello,* for the petitioner.

*Thomas C. Morrison,* for the respondent.

OPINION

STERRETT, *Judge*: By statutory notice dated December 6, 1979, respondent determined a deficiency in petitioner's Federal estate tax in the amount of $9,476.06. After concessions, the sole issue for our decision is whether petitioner is entitled to a charitable deduction under section 2055, I.R.C. 1954, for amounts passing to qualifying charitable beneficiaries after the termination of a life estate.

The facts have been fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Decedent Eliza W. Blackford died testate on January 30, 1977. Petitioner, the Estate of Eliza W. Blackford, is an estate

being administered by the Bank of Charles Town. The administrator is a West Virginia corporation whose principal place of business at the time of the filing of the petition was Charles Town, W. Va. Petitioner filed a timely Federal estate tax return with the District Director of Internal. Revenue on October 21, 1977.

The decedent executed her last will and testament on October 13, 1967.[1] In article Sixth of her will, decedent devised a life interest in her residence to her surviving spouse. The residence in question was a personal residence for purposes of section 2055(e)(2). Upon termination of the life estate, decedent's will directed her executor to sell the personal residence "at public sale or sales upon such terms as said [executor] shall deem best" and to distribute the proceeds of the sale in equal shares to four fire companies, all located in Jefferson County, W. Va.: Citizens Fire Company, Independent Fire Company No. 1, Friendship Fire Company of Bolivar-Harpers Ferry, and Shepherdstown Fire Department (hereinafter fire companies). All four of these companies are qualified charitable beneficiaries for purposes of section 2055. The bequest to the fire companies was not in the form of an annuity trust, a unitrust, or a pooled income fund as provided in section 2055(e)(2)(A). The will did not specifically subject the real estate to the payment of administration expenses.

The decedent was survived by her husband, S. Brooke Blackford, age 76, whose life estate in the residence became possessory upon decedent's death. Decedent's husband died on March 17, 1980. Pursuant to the terms of decedent's will, the executor sold the personal residence on May 7, 1980, and distributed the proceeds to the fire companies.

The residence was listed on decedent's Federal estate tax return at a value of $40,000, which consisted of $5,000 for the land and $35,000 for the improvements. On Schedule O of the estate tax return, petitioner. deducted $26,895.60 as the present value of the property passing to the fire companies. Respondent, in his notice of deficiency, denied the claimed deduction because it was not in the form of a charitable

---

[1] The decedent subsequently executed two codicils to her will, neither of which amended the provisions regarding the devise of the realty here at issue.

remainder unitrust, a charitable remainder annuity trust, or a pooled income fund.

The sole issue for decision is whether, under section 2055(a), an estate is entitled to a charitable deduction of the present value of the remainder interest in decedent's personal residence where such residence was to be sold by the executor at the termination of a life estate granted by the decedent and the proceeds were to be distributed to charitable beneficiaries.

Section 2055(a) allows a deduction from the value of the gross estate for amounts passing to qualifying charitable beneficiaries. Section 2055(e)(2) disallows this deduction in the case of charitable contributions of remainder interests unless the property involved is placed in a charitable remainder annuity trust, a charitable remainder unitrust (both described in section 664), or a pooled income fund (described in section 642(c)(5)).[2] However, the parenthetical language of section 2055(e)(2) excepts interests "described in section 170(f)(3)(B)" from section 2055(e)(2) disallowance. One of the interests so described is a "remainder interest in a personal residence or farm." Sec. 170(f)(3)(B)(i). Together, these sections permit a deduction from the gross estate of the value of a remainder interest in a personal residence when such interest is granted in favor of a qualifying charitable beneficiary. Therefore, the specific question we address is whether, upon the termination of the husband's life estate, the personal residence must be distributed in kind to the charitable beneficiaries in order for the gift to qualify for the charitable deduction.

---

[2]Sec. 2055(e) provides in pertinent part as follows:

SEC. 2055(e). DISALLOWANCE OF DEDUCTIONS IN CERTAIN CASES.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) Where an interest in property (other than an interest described in section 170(f)(3)(B)) passes or has passed from the decedent to a person, or for a use, described in subsection (a), and an interest (other than an interest which is extinguished upon the decedent's death) in the same property passes or has passed (for less than an adequate and full consideration in money or money's worth) from the decedent to a person, or for a use, not described in subsection (a), no deduction shall be allowed under this section for the interest which passes or has passed to the person, or for the use, described in subsection (a) unless—

(A) in the case of a remainder interest, such interest is in a trust which is a charitable remainder annuity trust or a charitable remainder unitrust (described in section 664) or a pooled income fund (described in section 642(c)(5)), or

(B) in the case of any other interest, such interest is in the form of a guaranteed annuity or is a fixed percentage distributed yearly of the fair market value of the property (to be determined yearly).

Respondent contends that petitioner is not entitled to the claimed deduction because the interest received by the fire companies was not a remainder interest in a personal residence but was a remainder interest in the proceeds from the sale of a personal residence. Petitioner asserts that the interest granted to the four charitable beneficiaries constitutes a remainder interest in a personal residence under West Virginia law and, therefore, is deductible by the estate under section 2055(a).

On its face, the statute provides minimal insight into the resolution of this issue. Therefore, we turn to the legislative history of section 2055(e) for enlightenment.

Section 2055(e) was enacted in 1969. Prior to its enactment, estate and income tax deductions were generally available to taxpayers who made charitable contributions of remainder interests subject to noncharitable income interests. In drafting the legislation, the House committee was attempting to insure that the amount of the charitable deduction reflected the value of the ultimate benefit to be received by the charitable remainderman. See H. Rept. 91–413 (1969), 1969–3 C.B. 237. Due to certain abuses which section 2055(e) was designed to correct, the deduction did not always correspond to the benefit received. For instance, when property was transferred into trust, it was possible for the trustee to invest the trust corpus in high-income, high-risk assets so as to maximize the income interest at the expense of the remainder interest. Such manipulation of the trust assets had the effect of depleting the eventual benefit to the charitable remainderman. Thus, the charitable deduction often did not accurately reflect the contribution subsequently received by the charitable organization. The House similarly was concerned with contributions of contingent remainder interests in trust and of remainder interests subject to unrestricted powers of invasion for the benefit of intervening noncharitable interests. Such phantom contributions yielded deductions despite the fact that the donee charities received little or no ultimate benefit. See H. Rept. 91–413, *supra*, 1969–3 C.B. at 237–238.

In short, valuation imprecision was the motivational force behind the 1969 amendment. The fact that the recipient of an income interest frequently had the ability, directly or indirectly, to deplete some or all of the remainderman's interest made

it impossible for the present value of the eventual charitable benefit to be calculated with any degree of certainty. To remedy the shortcomings of pre–1969 law, the House chose to limit the deductibility to contributions where the subject property was placed in either of two trust forms whose statutorily prescribed terms would prevent raiding of the remainder interest.[3] See H. Rept. 91–413, *supra*, 1969–3 C.B. at 238. While these trusts did not guarantee that the charitable deduction would reflect the precise value of the ultimate charitable benefit, they did make it more likely that the deduction would correspond to such benefit by removing the opportunity for abuse.

The Senate Finance Committee, while agreeing with the House on the need for tighter rules in this area, chose to expand the list of deductible contributions to include pooled income fund arrangements and outright gifts of certain types of real property subject to a noncharitable life estate. S. Rept. 91–552 (1969), 1969–3 C.B. 479–480. The Senate recognized that an outright gift of real property subject to a life estate was an established form of charitable giving that was not susceptible to abuse. Since the possibility of abuse and consequent valuation problems were considered remote, the Senate concluded that this form of gift-giving should yield a deduction. Thus, a donor was allowed to make an inter vivos gift of his personal residence without forfeiting the right to possession until death. Likewise, a donor was allowed to make a testamentary gift of his personal residence without leaving his surviving spouse in the cold.

The tightening up of the rules governing split-interest gifts was undertaken expressly to insure that the amount of the charitable deduction corresponded with the value of the charitable benefit ultimately received. We do not see how this purpose is subverted by the form of the instant disposition. Up until the date of sale, the disposition in our case was identical to the in-kind disposition that was perceived by the Senate to offer insignificant opportunity for abuse. Absent abuse in the

---

[3]The House proposal permitted deductions only in the case of a charitable remainder annuity trust or a charitable remainder unitrust (both described in sec. 664). H. Rept. 91–413 (1969), 1969–3 C.B. 237–238. Neither of these two trust forms is before the Court in this case.

sale, itself, a directed sale provision will have little effect on the value received by the charity, and since section 2055(e) was enacted to cure valuation imprecision, it does not appear that the instant disposition was an intended casualty of the 1969 legislation.

The personal residence exception to section 2055(e)(2) was not created to supplement the real estate holdings of charities.[4] Rather, as stated above, it was carved out to permit the continuation of an established form of giving that enabled a homeowner to make a lifetime gift of his house without forfeiting his lifetime possession or to make a testamentary disposition without depriving a dependent of possession. No legislative purpose is furthered by the actual passage of the personal residence in kind to the recipient charities.[5]

Respondent concedes that there was no abuse in this case.[6] However, we are well aware that actual abuse is not necessary; it is the *possibility* of abuse that respondent claims must be thwarted. See *Estate of Brock v. Commissioner*, 71 T.C. 901, 910 (1979), affd. 630 F.2d 368 (5th Cir. 1980). Yet respondent's brief has failed to reveal any specific abuse that is made possible by a sale provision, such as the one in decedent's will, aside from the potential for manipulation of selling expenses and selling price due to the executor's discretion in the manner of sale. Where the estate bears the selling expenses,[7]

---

[4]Most fire companies seemingly would have little practical use for a one-fourth interest in a personal residence and could be expected to sell such interest as soon as possible. See note 6 *infra*.

[5]Under State law, a provision in a will directing the executor to sell real estate gives the executor only a power of sale, and no interest in the land. Title to the land passes directly to the heirs or devisees, subject to the power of sale, and such heirs or devisees are entitled to the use of the realty until the power is executed. Thus, technically speaking, the personal residence did in fact pass to the charities, albeit for a brief duration. 8 Michie, Jurisprudence, Virginia and West Virginia, Executors and Administrators, sec. 79, p. 195 (1949).

[6]In directing her executor to sell the personal residence, decedent's motive, we can speculate, was to save the designated charities the trouble and expense of selling the property themselves. Such trouble and expense would no doubt have been compounded by the fact that representatives of each of the four charities would have had to agree on the terms and conditions of sale. The will provision obviated this necessity.

[7]Under West Virginia law, the real estate of the decedent is not subject to the payment of administration expenses unless the will specifically so provides. See *McFaddin v. United States*, 80 Ct. Cl. 794, 10 F. Supp. 286 (1935). In our case, there was no such provision, and, therefore, it would appear that such expenses are borne by the estate.

manipulation of those expenses would not affect the value received by the charitable remainderman.[8] Thus, we do not believe that this hypothetical abuse is the type of abuse that section 2055(e) was designed to curb. Moreover, such "manipulation" can be corrected under other authority.[9]

Conceivably, there might be temptation to manipulate the selling price, possibly to allow a relative of the decedent to purchase the residence at a greatly reduced price. However, the remaindermen are protected against such manipulation under State law.[10] The executor is held to the highest degree of good faith and is required to administer the estate so as to preserve and protect it for ultimate distribution. Breach of this fiduciary duty will result in liability to the injured parties. *Lapinsky's Estate v. Sparacino*, 148 W. Va. 38, 132 S.E.2d 765, 766 (1963). Additionally, the remaindermen would have a fiduciary obligation of their own to institute an action to set aside any "sweetheart" sale on the ground of fraud. See generally 8 Michie Jurisprudence, Virginia and West Virginia, Executors and Administrators, sec. 137, pp. 246–247 (1949).[11] Finally the charities, by unanimous consent, can elect to force the executor to ignore the direction to sell and to distribute the residence in kind. *John v. Turner*, 121 W. Va. 447, 6 S.E.2d 480, 482 (1939); *Brown v. Miller's Ex'rs.*, 45 W. Va. 211, 31 S.E. 956 (1898).[12] These legal rights afford the remaindermen adequate

---

[8]If the gift is a net gift, such that the expenses are borne directly by the charity, the executor would be controlled by the same standards that prevent manipulation of the selling price. See below.

[9]Selling expenses are deductible under sec. 2053(a)(2) only if they are "necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution." Sec. 20.2053–3(d)(2), Estate Tax Regs. Additionally, the amount sought to be deducted must be reasonable under the circumstances. *Pitner v. United States*, 388 F.2d 651, 659 (5th Cir. 1967).

[10]With respect to this statement, we note that the possibility of a "sweetheart" sale also appears to exist in the case of either an annuity trust or a unitrust where, for example, such trust provides that the corpus of the trust be reduced to cash and distributed to charity at the termination of the noncharitable income interest. Nonetheless, a charitable deduction is presumably allowable when contributions are made in such forms. Congress apparently was convinced, as are we, that State law provides sufficient protection against such abuse. See Rev. Rul. 72–395, 1972–2 C.B. 340, 345.

[11]See also 31 Am. Jur. 2d, Executors and Administrators, sec. 401 (1967).

[12]Oddly enough the respondent, himself, in a very recent private ruling letter (IRS Letter Ruling 8141037), took a position which supports our holding and is contrary to the position he asserts herein. The ruling involves a decedent who bequeathed a remainder interest in his farm to charity under a will that directed his executor to sell the farm and distribute the proceeds to the designated charity. The respondent ruled that a charitable deduction *was*

protection against the diminution of their interest and therefore create an effective deterrent to the specified abuses.[13]

There is no statutory requirement that the charity must somehow use the property as a personal residence in order for the gift to give rise to a deduction. In fact, there is nothing to prevent a charity from selling its remainder interest long before the life tenant dies and in that manner transforming its interest into cash.[14]

Respondent attempts to draw support from *Estate of Brock v. Commissioner, supra.* That case, however, did not address the issue here confronted. *Estate of Brock* dealt with the characterization of real estate when possessed by the decedent and concluded that the property was neither a personal residence nor a farm at that time. For that reason, the contribution was held to fall outside of the section 170(f) exception. The regulations support the proposition that the time of characterization is at the decedent's death. The statute requires that the contribution be of a "remainder interest in a personal residence or farm." Sec. 170(f)(3)(B)(i). The regulations define "personal residence" as "any property which was used by the decedent as his personal residence even though it was not used as his principal residence." Sec. 20.2055–2(e)(2)(ii), Estate Tax Regs. Thus, the regulations require characterization of the property as a personal residence at the time of death and not at some subsequent date. Here, because

---

*allowable* under sec. 2055 since local law gave the charity the power to override the testamentary sale provision and to elect to take the property in kind. As this same power exists under West Virginia law, *supra,* our facts are indistinguishable, in all relevant particulars, from those of the letter ruling. See *Rowan Cos. v. United States,* 452 U.S. 247 (1981) (private letter ruling cited, not for precedential purposes, but to show inconsistent treatment under the law).

[13]Although we are not here concerned with a trust, we do note that such protection is not always available in the trust situation because the laws in some States do not prevent trustees from exercising investment powers with a view to maximizing the benefit to the income beneficiaries at the expense of the charitable remainder interest (*Miami Beach First National Bank v. United States,* 443 F.2d 475, 479 (5th Cir. 1971)), or from exercising administrative powers to divert corpus to noncharitable beneficiaries (*Greer v. United States,* 448 F.2d 937, 948 (4th Cir. 1971)); hence, sec. 2055(e)(2) was needed to add clarity and uniformity to the law.

[14]Neither should the life tenant's use be relevant. The life tenant's use of the property subsequent to the decedent's death should not retroactively deprive the estate of the charitable deduction. Otherwise, there would be inconsistent treatment depending upon whether the statute of limitations for determining estate tax deficiencies had expired at the time the life tenant ceased using the property as a personal residence.

the parties agree that the decedent used the property as a personal residence, the determination in *Estate of Brock* is not relevant.

Neither does *Ellis First Nat. Bank of Bradenton v. United States*, 213 Ct. Cl. 44, 550 F.2d 9 (1977), strengthen the respondent's position. In *Ellis*, personal residences and other assets were placed in a trust which had decedent's sister as its income beneficiary and charities as its remaindermen. The trustee was given the power, during the sister's lifetime, to sell the personal residences and invest the proceeds. Had the trustee exercised this power, the resultant trust would have been susceptible to the same abuses that section 2055(e) was intended to eliminate, for the proceeds from the sale of the personal residences could have been invested "in a manner which would deplete the value of the interests of the charities." *Ellis First Nat. Bank of Bradenton v. United States*, 213 Ct. Cl. at 58, 550 F.2d at 16.[15] Unlike the trustee in *Ellis*, the life tenant in our case had no power to transform the remaindermen's interest in the personal residence into cash. This restraint effectively insulated the value of the remainder interest from depletion by the life tenant.

The disposition of the personal residence in this case was identical to the normal qualifying scheme up until the death of the life tenant. The fire companies had adequate protection under State law against diminution of the value of their remainder interest between the time of the life tenant's death and their receipt of the proceeds from the sale of the personal residence.

---

[15]In *Ellis First Nat. Bank of Bradenton v. United States*, 213 Ct. Cl. 44, 58, 550 F.2d 9, 16 (1977), the Court of Claims stated by way of dictum that the charitable remaindermen should not be deprived of the certainty of receiving the deeds to the property in question. However, we believe that the proper focus, as indicated by the legislative history, is not upon the certainty of receiving the *deeds* to the property but on the certainty of receiving the value of the property.

Similarly, in *Estate of Brock v. Commissioner*, 71 T.C. 901 (1979), affd. 630 F.2d 368 (5th Cir. 1980), this Court stated:

"We think that when Congress made an exception for such gifts, it contemplated transfers that passed the residential or farming uses of the land, or at least the surface estate of land suitable for such uses, to the noncharitable tenant and the charitable remainderman. [71 T.C. at 909.]"

We do not believe that the personal residence exception was created to enlarge the real estate holdings of charities. It was created in order to continue to permit an established form of charitable giving deemed not to be susceptible to abuse.

The personal residence exception was created in explicit recognition of the fact that the abuses to which section 2055(e) disallowance was directed were unlikely to occur in this context. The superficially altered form of the instant transaction does not increase the potential for such abuses. For this reason, we find that the decedent's disposition of her personal residence falls within the personal residence exception to section 2055(e)(2) and therefore qualifies for the charitable deduction under section 2055(a).

Due to concessions,

*Decision will be entered under Rule 155.*

Reviewed by the Court.